## LAW OFFICES OF
## COPELAND, FRANCO, SCREWS & GILL, P. A.

PROFESSIONAL ASSOCIATION
444 SOUTH PERRY STREET
MONTGOMERY, ALABAMA 36104

MAILING ADDRESS:
P. O. Box 347
MONTGOMERY, AL 36101-0347

RICHARD H. GILL
ROBERT D. SEGALL
JOHN A. HENIG, JR.
JAMES M. EDWARDS
LEE H. COPELAND

OF COUNSEL:
HERMAN B. FRANCO
SUSE A. SCREWS, JR.

GEORGE W. WALKER, III
MITCHELL H. BOLES
J. DAVID MARTIN
SHANNON L. HOLLIDAY
MARTHA D. ROBY
C. NELSON GILL
ALBERT W. COPELAND
(1927-1983)
DEXTER C. HOBBS
(1955-1990)

TELEPHONE (334) 834-1180         FACSIMILE (334) 834-3172

Writer's Email Address:   boles@copelandfranco.com

July 1, 2004

**Via Facsimile (205) 328-7234**

Eric J. Breithaupt
Christian & Small
505 20th Street North
Suite 1800
Birmingham, Alabama 35203-2696

**Via Facsimile (205) 254-1999**

Timothy M. Lupinacci
Maynard, Cooper & Gale, P.C.
1901 6th Avenue North
Suite 2400
Birmingham, Alabama 35203

RE: *Double A Trailer Sales, Inc. v. Dorsey Trailer Company, Inc. and SouthTrust Bank, N.A.*
[Our File No. 9900.001]

Dear Eric:

I am writing to provide each of you with the proposed settlement terms. The proposed settlement terms are as follows:

- Dorsey will delivery the five completed trailers on Tuesday, July 6, 2004 to a neutral location in Elba, Alabama, provided that the following is accomplished: (i) the LOC, set forth below, is in place; (ii) the 160 remaining trailers, as described below, have been repriced; and (iii) Double A and Dorsey have mutually agreed to the schedule of delivery for the 160 remaining trailers;
- With respect to the 10 GSA trailers, Double A will remit $125,000 to Dorsey prior to the delivery of these trailers. Dorsey will



Street 0063

complete these 10 GSA trailers by July 30, 2004;
- With regard to the approximately $525,000 debt, Dorsey will execute an unsecured note to be paid in interest only at prime plus one for the first year, and then to be retired on a 10 year amortization with a 5 year call at an interest rate of prime plus one percent;
- With regard to the approximate $200,000 debt, representing the ten remaining trailers, Dorsey will execute an unsecured note to be paid over 5 years at an interest rate of prime plus one percent;
- Except for the ten GSA trailers, all other trailers will have to be repriced;
- Double A will guarantee payment for the 160 trailers already ordered from Double A. As stated above, these trailers will be repriced. Double A will post an irrevocable letter of credit on terms satisfactory with SouthTrust Bank;
- Except for the 10 GSA trailers and the five completed trailers, all trailers must be paid for according to the repricing schedule and the mutually agreed upon delivery schedule for these trailers;
- Return of all MSO related to all trailers;
- The federal court case will be dismissed with prejudice as to all parties; and
- Mutual releases with standard terms exchanged between all parties.

If these terms are acceptable to your client, please indicate your client's acceptance by signing below and returning this letter to me by Friday. Upon my receipt of this fully executed letter, I will begin to prepare the final settlement documents, joint stipulation and dismissal and unsecured notes.

I look forward to hearing from you.

Sincerely yours,

Mitchel H. Boles

Accepted By:

_____
Eric J. Breithaupt, as Attorney for Double A Trailer Sales, Inc.


Accepted By:

_____
Timothy M. Lupinacci, as Attorney for SouthTrust Bank, N.A.

*[FAX: 3 Pages]*

Street 0065

### steve diller

**From:** "steve diller" <dillerlaw@wcoil.com>
**To:** "Neier, David" <DNeier@winston.com>
**Cc:** "Eric Breithaupt" <EJB@csattorneys.com>
**Sent:** Saturday, March 20, 2004 10:19 AM
**Subject:** Re: Dorsey

David,

I certainly understand your disappointment, but my client would categorically deny any misuse of any confidential information. In fact, it is my understanding that he was never given any financial statements or records that were requested. It is also clear that managment apparently chose to not reveal multiple material financial issues, which were subsequently discovered simply because of the search of public records and then following up as a product of due diligence. I believe that it is clear that because of the past actions of Dorsey management in treatment of former employees, its current employees and other vendors, any harm to Dorsey was long ago caused by management. I trust that the Bankruptcy Court will be capable of weighing the merits of both positions.

Steve

----- Original Message -----
**From:** Neier, David
**To:** steve diller
**Cc:** Eric Breithaupt
**Sent:** Friday, March 19, 2004 6:53 PM
**Subject:** RE: Dorsey

Steve, I am disappointed in your client's decision. Until now, I have refrained from commenting on your client's actions in the hopes that we could reach a mutually satisfactory agreement. It is quite clear that your client misused confidential information that was given to him pursuant to a confidentiality agreement for the purpose of exploring a transaction with Dorsey. As a result, there has already been substantial damage to Dorsey. If you file an involuntary petition, we will pursue all available remedies with respect to this matter, including Dorsey's rights under sections 303(i) and 303(e). Regards, DN

David Neier
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166
(212) 294-5318
(212) 294-4700 (fax)
mailto:dneier@winston.com

-----Original Message-----
**From:** steve diller [mailto:dillerlaw@wcoil.com]
**Sent:** Friday, March 19, 2004 4:41 PM
**To:** Neier, David
**Cc:** Eric Breithaupt
**Subject:** Dorsey

David,



EXHIBIT 23

3/20/2004

After our telephone conversation of yesterday, I have discussed the approach of "bridge financing" to a projected sale date of April 25 with Mr. Wannemacher as well as the Alabama financial interests. I would indicate that there is simply no support for that approach and I have again been directed to move towards the filing of an involuntary petition against the Debtor. Hopefully, I will be able to put that into place on Monday, March 22, 2004. I certainly regret that we were unable to reach a mutually satisfiable agreement, but the numbers simply do not work given my client's first priority is to be paid and the second is that if he cannot be paid, then to own the company and work through the repayment over time. Obviously with the order of priority being what it is if your client wishes to protect its interests and purchase the company, my client will achieve his goals. If no one steps forward to resolve the Bank's interest, my client intends to do so which would be at a maximum cost of 2 million and then use whatever money is saved up to 4.75 to use as working capital.

Steve

The contents of this message may be privileged
and confidential. Therefore, if this message has
been received in error, please delete it without
reading it. Your receipt of this message is not
intended to waive any applicable privilege.
Please do not disseminate this message without
the permission of the author.

3/20/2004

Street 0070

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA JEFFE

SOUTHERN DIVISION


CIVIL ACTION NO: 1:04-CV-004640WHA-CSC


DOUBLE A TRAILER SALES, INC,

    Plaintiff,

vs.

DORSEY TRAILER COMPANY, INC.,

and SOUTHTRUST BANK, N.A.,

    Defendant.


DEPOSITION

OF

TASHA DOLAN


REPORTED BY: Kelly Jackson

    Registered Professional

    Reporter

    and Notary Public

ORIGINAL

## FREEDOM COURT REPORTING

Page 140

1 signature?

2   A.   It is.

3   Q.   So what did you understand the
4 reason for signing Exhibit 10 was?

5   A.   To begin exploring the
6 possibility of Double A purchasing an
7 interest in Dorsey.

8   Q.   Did you have the discussion
9 with Mr. Mansfield before or after
10 Exhibit 10 was signed?

11   A.   I don't remember.  I really
12 don't remember.  I don't.  I sorry.

13   Q.   Let's talk about
14 documentation.  Do you recall a dealers
15 meeting back in the fall of 2003?

16   A.   There were a couple of dealer
17 meetings.  So possibly, yes.

18   Q.   Do you remember the one in the
19 old engineering building?

20   A.   Yes.

21   Q.   Tell me what you remember about
22 that.

23   A.   What do I remember about it?

Page 136

between the company and Double A. So it doesn't surprise me that a day apart two different documents were signed because things were moving very quickly and changing quickly.

Q. What was changing, tell me about what was changing.

A. Well, Stephen Mansfield called and was asking questions about the loan and the collateral. And he was indicating that they might file an involuntary bankruptcy.

Q. They being Double A?

A. Yes.

Q. Tell me about that.

THE VIDEOGRAPHER: We are off the record at two-o-two p.m.

(Short recess.)

THE VIDEOGRAPHER: We are back on the record at two-o-nine p.m.

Q. When we went off the record, we were talking about Mr. Mansfield and that he stated to you I believe that

Double A might file an involuntary against Dorsey. Do you recall that?

A. Yes.

Q. Did you have a direct conversation with him?

A. I did.

Q. Tell me about that direct conversation and to the best of your knowledge when it occurred.

A. I don't know exactly when it occurred.

Q. How about around Exhibit 13?

A. I am sure it occurred sometime in February. I just don't know when. And he was specifically looking for Chriss because he wanted to tell him and he said if I can't find him, I am going to tell you, we are going -- we are looking to file an involuntary bankruptcy.

Q. And why did he say they were going to do that?

A. He -- I don't remember. I just

Page 138

know that he felt like -- he didn't like the loans. He just had a level of discomfort from what I remember.

    Q. Now, he was counsel for Double A; correct?

    A. That is what this memo says. It says Stephen J. Mansfield, our attorney.

    Q. Prior to February 11th, had you ever talked to Mr. Mansfield prior to that time?

    A. No.

    Q. So this would have been your first contact with him, Exhibit 14?

    A. Yes.

    Q. Do you remember if you received the call from him prior to receiving Exhibit 11, in other words, was Exhibit -- I mean Exhibit 14. Was Exhibit 14 the document that said we are going to file an involuntary unless you sign?

    A. I don't remember the sequence

of events.

Q. The same thing for 13, he didn't call you and say I need for you to sign this or filing an involuntary?

A. I don't remember the sequence of events.

Q. Was there any discussion about that, though, we need to have this documented?

A. I don't think it was an either/or.

Q. It was do it or else?

A. No. I don't -- I really don't recall. I don't think it was either/or. I think it was just this is something we are considering.

Q. Now, do you recall -- scratch that. Get Exhibit 10 in front of you, please.

A. Okay.

Q. If I am correct, you signed as the attestator for Mr. Street's signature on the last page; is that your