```
1                        an expert, or do I need to
2                        qualify him?
3              MR. BREITHAUPT:  Why don't you go
4                        ahead and qualify him?
5              MR. MEMORY:  Okay.
6    Q.   State your name, please, sir.
7    A.   William H. Carr.
8    Q.   And give the Court your address -- your
9         address where you live and also the address
10        where you work.
11   A.   My home address is 110 Country Club Heights
12        Boulevard, Enterprise, Alabama.  My office
13        address is 1117 Highway 84 Bypass,
14        Enterprise, Alabama.
15   Q.   Are you employed?
16   A.   Yes.
17   Q.   In what capacity?
18   A.   I'm a partner with the firm of Carr, Riggs
19        & Ingram.
20   Q.   And what does that firm do?
21   A.   Practice accounting, public accounting.
22   Q.   Okay.  And do you practice accounting as
23        well?
```

1    A.   Yes, I do.

2    Q.   Have you -- Before we go any further, I'd

3         like to talk about your educational

4         background.  Could you start with, first of

5         all, your undergraduate training?

6    A.   I graduated from Enterprise Junior College,

7         two-year college, and then went to the

8         University of Alabama and got a B.S. degree

9         in accounting.

10   Q.   Okay.  And after that did you become

11        distinguished or qualified otherwise?

12   A.   I did not take any additional college

13        courses.  I sat for and passed the CPA

14        exam.

15   Q.   Okay.  Now, when did you graduate from the

16        University of Alabama?

17   A.   1969.

18   Q.   And when did you become qualified as a

19        certified public accountant?

20   A.   I think it's 1970 or '71.

21   Q.   Okay.  And --

22   A.   There's a two year wait.

23   Q.   Are you licensed to practice accounting in

1      the state of Alabama?

2 A.    Yes, I am.

3 Q.    Any other states?

4 A.    The state of Tennessee and, I believe, the

5      state of Florida.

6 Q.    Have you been continuously licensed to

7      practice since 1971?

8 A.    Yes, I have.

9 Q.    Have you distinguished yourself in any

10      other respects in the accounting field?

11 A.    I'm a managing partner of the firm, and

12      basically that's it.

13 Q.    Any additional courses or training that

14      you have --

15 A.    We have CPE courses annually that I've

16      taken over the last 25, 30 years.

17 Q.    And how long have you been in the

18      accounting profession?

19 A.    Since 1969.

20 Q.    Okay.  And during that period of time, do

21      you have an estimate as to how many clients

22      that you have serviced?

23 A.    Probably 2500 to 3,000.

1    Q.    And are many of these regular clients that

2          you have handled from year to year?

3    A.    Yes.

4    Q.    Do you also assist in referring various

5          clients to other people in your firm?

6    A.    Yes.

7    Q.    During this period of time, have you had

8          occasion to render assistance in both the

9          tax -- in the tax area?

10   A.    Yes.

11   Q.    In the purchase and sale of assets area?

12   A.    Yes.

13   Q.    In other areas dealing with the

14         administration of existing firms?

15   A.    Yes.

16   Q.    Planning and the implementation of

17         different plans in the accounting area?

18   A.    You know, primarily, I work in the tax

19         area.  We do early on audits.  I primarily

20         today do transactional work.  I do mergers

21         and acquisitions.  I do litigation

22         support.  I do anything transactional where

23         I place loans for clients, work out

1          February of 2004 with its creditors on

2          negotiated terms.  Do you remember that?

3    A.    That was my understanding, yes.

4    Q.    Would you agree that having to negotiate

5          terms of payment is different from paying

6          bills as they come due?

7    A.    Yes.  Well, it's different than paying them

8          by the initial terms of the transaction.

9    Q.    Was the debtor routinely having to do that

10         with most of its creditors at that point in

11         February of '04?

12   A.    I'd have to go back and -- I don't know

13         whether it's mostly or some of or whether

14         it would be the larger vendors.  But I do

15         know there were conversations made; there

16         were terms worked out.  And it's my

17         understanding that things were being paid

18         in accordance to those terms.

19   Q.    But they were special payment terms,

20         weren't they?

21   A.    They were termed worked out, yes.

22              MR. BREITHAUPT:  That's all I

23                 have.

1          MR. MEMORY:  I have nothing

2               further.

3          MR. GRILL:  I have nothing.

4     * * * * * * * * * * * *

5   FURTHER DEPONENT SAITH NOT

6     * * * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA JEFFE

3         SOUTHERN DIVISION

4

5  CIVIL ACTION NO:  1:04-CV-004640WHA-CSC

6

7  DOUBLE A TRAILER SALES, INC,        ORIGINAL

8         Plaintiff,

9  VS.

10  DORSEY TRAILER COMPANY, INC.,

11  and SOUTHTRUST BANK, N.A.,

12         Defendant.

13

14           DEPOSITION

15              OF

16          TASHA DOLAN

17

18  REPORTED BY: Kelly Jackson

19               Registered Professional

20               Reporter

21            and Notary Public

22

23

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM,  ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 136

between the company and Double A. So it doesn't surprise me that a day apart two different documents were signed because things were moving very quickly and changing quickly.

Q. What was changing, tell me about what was changing.

A. Well, Stephen Mansfield called and was asking questions about the loan and the collateral. And he was indicating that they might file an involuntary bankruptcy.

Q. They being Double A?

A. Yes.

Q. Tell me about that.

THE VIDEOGRAPHER: We are off the record at two-o-two p.m.

(Short recess.)

THE VIDEOGRAPHER: We are back on the record at two-o-nine p.m.

Q. When we went off the record, we were talking about Mr. Mansfield and that he stated to you I believe that

## FREEDOM COURT REPORTING

Page 137

Double A might file an involuntary

against Dorsey.  Do you recall that?

        A.    Yes.

        Q.    Did you have a direct

conversation with him?

        A.    I did.

        Q.    Tell me about that direct

conversation and to the best of your

knowledge when it occurred.

        A.    I don't know exactly when it

occurred.

        Q.    How about around Exhibit 13?

        A.    I am sure it occurred sometime

in February.  I just don't know when.

And he was specifically looking for

Chriss because he wanted to tell him and

he said if I can't find him, I am going

to tell you, we are going -- we are

looking to file an involuntary

bankruptcy.

        Q.    And why did he say they were

going to do that?

        A.    He -- I don't remember.  I just

# FREEDOM COURT REPORTING

Page 138

know that he felt like -- he didn't like

the loans.  He just had a level of

discomfort from what I remember.

    Q.    Now, he was counsel for Double

A; correct?

    A.    That is what this memo says.

It says Stephen J. Mansfield, our

attorney.

    Q.    Prior to February 11th, had you

ever talked to Mr. Mansfield prior to

that time?

    A.    No.

    Q.    So this would have been your

first contact with him, Exhibit 14?

    A.    Yes.

    Q.    Do you remember if you received

the call from him prior to receiving

Exhibit 11, in other words, was

Exhibit -- I mean Exhibit 14.  Was

Exhibit 14 the document that said we are

going to file an involuntary unless you

sign?

    A.    I don't remember the sequence

Page 139

of events.

Q.    The same thing for 13, he didn't call you and say I need for you to sign this or filing an involuntary?

A.    I don't remember the sequence of events.

Q.    Was there any discussion about that, though, we need to have this documented?

A.    I don't think it was an either/ or.

Q.    It was do it or else?

A.    No.  I don't -- I really don't recall.  I don't think it was either/ or.  I think it was just this is something we are considering.

Q.    Now, do you recall -- scratch that.  Get Exhibit 10 in front of you, please.

A.    Okay.

Q.    If I am correct, you signed as the attestator for Mr. Street's signature on the last page; is that your

# FREEDOM COURT REPORTING

Page 140

1  signature?

2      A.    It is.

3      Q.    So what did you understand the

4  reason for signing Exhibit 10 was?

5      A.    To begin exploring the

6  possibility of Double A purchasing an

7  interest in Dorsey.

8      Q.    Did you have the discussion

9  with Mr. Mansfield before or after

10  Exhibit 10 was signed?

11      A.    I don't remember.  I really

12  don't remember.  I don't.  I sorry.

13      Q.    Let's talk about

14  documentation.  Do you recall a dealers

15  meeting back in the fall of 2003?

16      A.    There were a couple of dealer

17  meetings.  So possibly, yes.

18      Q.    Do you remember the one in the

19  old engineering building?

20      A.    Yes.

21      Q.    Tell me what you remember about

22  that.

23      A.    What do I remember about it?