# FREEDOM COURT REPORTING

Page 169

stronger company.    He has orders and we

have a plant.

    Q.    Didn't he -- wasn't he

basically able to through his prepayment

take over the -- almost the entire

capacity of Dorsey's production?

    A.    A substantial portion of it.

But, again, without looking at the

production schedules for that period of

time, I can't completely answer your

question.

    Q.    Let's say it is eighty

percent.    If he all of a sudden decided

to pull the plug and not fund or prepay,

how would that leave Dorsey?

    A.    It would leave it in a terrible

position.

    Q.    Isn't that what happened?

    A.    Isn't that what happened?

    Q.    Yes, ma'am.

    A.    Did he pull the plug, yes.

    Q.    Now, when we talked about the

exhibits regarding the notes, I think it

Page 170

1  was 13 and 14, you talked about Steve

2  Mansfield threatening an involuntary

3  bankruptcy?

4       MR. BREITHAUPT:  Object to the

5  form.  I am not sure that was her

6  testimony.

7       Q.   Is that your testimony?  I

8  think you said it was November 9th,

9  10th, 11th, somewhere in there?

10      A.   I don't know that I gave a

11 date.  I know when I said that, there

12 was --

13      MR. BREITHAUPT:  I think you

14 said November.  February was --

15      Q.   November, even better.

16      MR. BREITHAUPT:  Let's make it

17 what it was.

18      Q.   You can't remember?

19      A.   I am looking for the note.

20      Q.   It is -- look at 13 and 14.  It

21 was -- 13 and 14 was I believe when he

22 sent the secured promissory note.

23      A.   I have got it.  Okay.

# FREEDOM COURT REPORTING

Page 171

Q.    Is that about the time?  I think that is where we were talking at the time.

A.    I would say to the best of my recollection, and it is not accurate, it is not perfect, this would be -- this February 11 time frame is around the time he brought up the idea of an involuntary bankruptcy.

Q.    Did he ever tell you what he was going to do by using involuntary bankruptcy?

A.    If he did, I don't remember.

Q.    Did he ever tell you I will put you in involuntary bankruptcy and buy your company for very little money?

A.    He may have said that.  But I don't remember.

Q.    That doesn't sound out of reason, does it?  It may have been something he told you.

A.    It may have been.  But, again, I don't -- it has been over two years

# FREEDOM COURT REPORTING

Page 172

and a lot has gone on.

Q.    What did you do when you were
told by him that he may put you in
involuntary bankruptcy?

A.    I immediately called Chriss and
said we have a problem, you may want to
call this guy.

Q.    Did you have any more
discussions with Mr. Mansfield after
that?

A.    I did not.

Q.    Did you have any discussions
with any other lawyer for Double A after
that?

A.    Not that I remember.

Q.    Do you know a man by the name
of Steve Diller?

A.    The name sounds familiar.

Q.    Did you ever receive calls from
customers or vendors of Dorsey about
people calling them about joining them
in filing a bankruptcy petition?

A.    I did.

Page 173

Q.    Tell me who you got calls from.

A.    I got calls from I believe it
was Alcoa and Meritor.  Those are the
two that I remember distinctly saying
that Double A was circulating a letter
or making phone calls asking them to
join in an involuntary bankruptcy
filing.

Q.    Do you recall about when that
was?

A.    I don't.

Q.    Would it have been in that
February, March of '03 time period to
the best of your knowledge?

A.    It may have been.

Q.    Let me show you a document that
might jog your memory.


          (Whereupon, Defendant's Exhibit
          27 was marked for
          identification.)


Q.    Let me show you this document

# FREEDOM COURT REPORTING

Page 174

and ask you if you recall seeing that

document before?

    A.    Yes, I have seen this.

    Q.    How did it come about that you

saw this document the first time?

    A.    It was faxed to my fax machine

in my office.  I think it was a mistake.

    Q.    Does Western Extrusion -- do

you recall any calls from them?

    A.    I don't know if they called us

or not.  But maybe.

    Q.    How about Silco?

    A.    Did they call us and say we are

getting calls, no.

    Q.    But you do remember Arvin --

    A.    Meritor.

    Q.    Meritor.

    A.    We had a salesman named -- that

represented Arvin Meritor named Jim Ort.

    Q.    Jim Ort?

    A.    Yes.  He was friendly with --

he was friendly to Dorsey at the time

and he called and said you may want to

# FREEDOM COURT REPORTING

Page 175

know that this is going on.

Q.    Mr. Ort would be able to give us some time frame?

A.    He might be able to, sure.  You would have to ask him.

Q.    How about Alcoa, do you remember who that person was?

A.    Possibly their credit manager Mike Frye.

Q.    Mike Frye.  You notice this date of March 16, 2004 at the top?

A.    Yes.

Q.    What was going on at that time between Dorsey and Double A?

A.    What was going on?

Q.    What was the relationship? Were you still building trailers for them, still trying to build trailers?

A.    I don't remember exactly.  I know there was a time when we were building trailers and then we weren't. And what the break is on those -- on that date, I don't remember.

Case 3:05-cv-01107-MHT-VPM     Document 35-4     Filed 10/06/2006     Page 8 of 12
le A Trailer Sales, Inc. v. Street, Chriss W.
Mark Wannemacher

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

\*   \*   \*

DOUBLE A TRAILER SALES, INC.,

                Plaintiffs,

    vs.                         CASE NO. 3:05cv 1107-T

CHRISS W. STREET,

                Defendant.

\*   \*   \*

        Deposition of MARK WANNEMACHER, a

witness herein, called by the Defendant Chriss W.

Street for cross-examination pursuant to the

Federal Rules of Civil Procedure, taken before me,

Susan E. Ingraham, a Notary Public in and for the

State of Ohio, at the offices of Double A Trailer

Sales, 1750 East Fifth Street, Delphos, Ohio, on

Thursday, the 31st day of August, 2006, at 10:35

o'clock a.m.

            \*   \*   \*

Page 134

1  February.
2      Q.  And it was just I'm looking into a
3  company, I may need some money?
4      A.  Uh-huh.
5      Q.  Did you ever submit anything to
6  try and get money or was it just oral
7  conversation?
8      A.  No, because it all fell apart
9  before that.
10     Q.  And that was in late February?
11     A.  I may have sent him an e-mail or
12 something saying I was thinking about doing
13 something, could he investigate that, you know,
14 what they want, how much, you know, how big a
15 credit line, could I get five million or
16 something like that.
17     Q.  When do you recall first
18 contacting Mr. Diller to become involved in
19 this matter?
20     A.  The first time I remember
21 contacting Steve Diller was our meeting in
22 early March.
23     Q.  The March 5 meeting?
24     A.  I believe that's it, yes.
25     Q.  And had you ever used Mr. Diller

Page 135

1  before as an attorney?
2      A.  I don't think so.
3      Q.  How did you come by his name?
4      A.  Well, I knew Steve from a golf
5  trip I took a few years earlier with a group of
6  guys and he and Steve Mansfield were friends
7  and I met him when I went on a golf trip with
8  Steve Mansfield.
9      Q.  And do you recall what the
10 circumstances were of calling him up?  Did you
11 call him the day you got back?
12     A.  I think I called him the next day
13 after I got back, yes.
14     Q.  Did you talk to Steve and Steve
15 recommended him or how did that unfold?
16     A.  No, I knew Steve Diller was a
17 bankruptcy attorney.  And after I looked at
18 everything with Jim Stroh and we discussed it
19 on the way back from Alabama, I had the
20 sneaking suspicion that that was the way it was
21 going to go, so I called Steve Diller.
22     MR. BREITHAUPT:  I will interject --
23 I'm not objecting to anything, but because we're
24 dancing around, it could be privileged.
25     MR. HAMMOND:  I'll never get there.

Page 136

1      MR. BREITHAUPT:  Well, I'm just
2  asking that you all slow down so that if I need to
3  object.
4      Q.  You understand that if you and Mr.
5  Diller or you and Mr. Breithaupt have a
6  conversation and no third parties are there,
7  that you don't need to tell me about anything
8  that happened substance wise?
9      A.  Yes.
10     Q.  I can ask you if you had a
11 meeting, I can ask you when you had it, I can
12 even ask you who was there, but I can't ask you
13 about the substance.
14     A.  Okay.
15     Q.  So we're on the same page there.
16 I'm trying to be careful.
17     MR. BREITHAUPT:  You're fine.  I just
18 want to make sure everybody slows down so if I
19 need to object, I can.
20     Q.  All right.  I need to ask this
21 question.  I've read in variation e-mails
22 communications between attorneys where they
23 accuse Double A and their counsel of going out
24 and soliciting and petitioning creditors.  One
25 of those people is a man named Larry Saylor,

Page 137

1  and he is with a company in Arizona.
2      A.  Sealco?
3      Q.  Yes.  Do you recall having any
4  conversation with him?
5      A.  No.
6      Q.  He recalls having a conversation
7  with you.  And he said he had a conversation
8  with you and it was about joining in the filing
9  of a petition.  Do you recall that
10 conversation?
11     A.  I thought I met with a girl named
12 Krackhaut, K-R-A-something.
13     Q.  He said he never met you, he said
14 he talked to you on the phone.
15     A.  Well, it could be possible.  I
16 mean, I knew I contacted Sealco for -- but that
17 was well after all this started.
18     Q.  When you say well after all this
19 started, I have a letter from Mr. Diller dated
20 March 16 where he says that they've already
21 contacted Sealco, it had to be between the 5th
22 -- I'm just thinking with you -- and the 16th
23 if that's the first time you truly thought of
24 filing bankruptcy?
25     A.  I didn't file bankruptcy.

Page 138

1  Q. If that's what when you were truly
2  thinking of having a bankruptcy filed against
3  Dorsey was the day after the meeting on
4  March 5.
5  A. Right.
6  Q. Is that your testimony?
7  A. Yeah.
8  Q. Before that, you didn't have any
9  intent to file a bankruptcy petition?
10  A. No.
11  Q. And before that, you had not
12  engaged Mr. Diller or talked to him about that?
13  A. No.
14  Q. All right. Now you did have a
15  discussion with somebody at Sealco, you do
16  remember that?
17  A. Not before March 5.
18  Q. But after March 5?
19  A. Yes.
20  Q. And would you believe it was soon
21  after, since Mr. Diller's letter of March 16
22  seems to indicate they had been contacted?
23  A. I would say it would be between
24  the 5th and 16th, yes.
25  Q. And how did you know to contact

Page 139

1  them?
2  A. Mr. Diller told me to contact
3  them.
4  Q. How did Mr. Diller know?
5  A. I have no idea.
6  Q. How would Mr. Diller know who
7  might be a creditor of Dorsey?
8  MR. BREITHAUPT: I will object to the
9  extent it calls for communications between the
10  client and counsel.
11  THE WITNESS: Do I need to answer
12  that?
13  MR. BREITHAUPT: No. If it involved
14  a conversation between you and Mr. Diller, you
15  don't have to answer that.
16  THE WITNESS: It did.
17  Q. Was Mr. Stroh present in any of
18  your conversations with Mr. Diller?
19  A. No.
20  Q. Was anybody other than an employee
21  of Double A present or on the phone?
22  A. There was nobody other than me
23  that ever talked to Steve Diller about this.
24  Q. Other than Mr. Breithaupt?
25  A. That's an employee of Double A.

Page 140

1  Q. All right. What did you discuss
2  with Sealco?
3  A. We wanted to know if they would be
4  interested in joining us in a petition for
5  involuntary bankruptcy.
6  Q. And who did you speak to?
7  A. I thought it was -- I can't
8  remember her name -- but it was a woman and
9  then she referred me to her manager. And he
10  gave me a plant tour and that's who I talked
11  to. I don't remember their names, but that
12  could be Mr. Saylor, I don't know.
13  Q. So you actually visited their
14  plant?
15  A. Yes, it was in Phoenix.
16  Q. Okay. And what did she say?
17  A. They said they'd be back with me.
18  They said they'd get back to us.
19  Q. Did they say anything else? Did
20  they say they'd only do it if X and Y did it
21  like it suggests in Mr. Diller's letter? Arvin
22  Meritor?
23  A. They didn't give me an answer.
24  Q. No answer?
25  A. They said they would be back with

Page 141

1  Mr. Diller.
2  Q. Okay. Do you know if they ever
3  got back with Mr. Diller?
4  A. Do I know?
5  Q. Yes.
6  A. I think they did.
7  Q. Did you contact anyone else?
8  A. Me, personally?
9  Q. Yes.
10  A. I don't recall contacting anyone.
11  Q. Western Extrusion?
12  A. Where are they located?
13  Q. I'm sure I could find that out,
14  but I don't know.
15  A. I don't think I did.
16  Q. Okay. Arvin Meritor?
17  A. No.
18  Q. Any other creditors?
19  A. No. Not me personally.
20  Q. Okay.
21  A. The only reason I did Sealco is
22  because I was in Phoenix.
23  Q. How long has Mr. Mansfield
24  represented Double A?
25  A. That's a good question. My father

Page 142

1  used him for some things, so I would say on and
2  off for 25, 30 years.
3      Q.  Is he more your father's age?
4      A.  No, Steve and I went to school
5  together.
6      Q.  Okay.  Your age?
7      A.  Yes.
8      Q.  Okay.  So would you consider him
9  your outside corporate counsel or whatever that
10  would be or do you have other counsel?
11      A.  Well, we don't actually retain a
12  lawyer, so I consider him a friend who I go to
13  when I think I need legal advice.
14      Q.  You would agree that on numerous
15  occasions Double A, through its counsel, and I
16  think the word threatened is fair, threatened
17  to file an involuntary petition?
18      MR. BREITHAUPT:  Object to form.
19      A.  Yes.
20      Q.  At the time that those overtures
21  were made, did you have three creditors that
22  could file a petition who had already signed on
23  and agreed to support an involuntary petition?
24      A.  Not to my knowledge.  I can't tell
25  you what the threat would have been if there

Page 143

1  was a threat because I didn't issue it.  But as
2  I understand it from conversation with -- I
3  better stop because I don't want to say what I
4  had conversation with Mr. Diller about.
5      Q.  Don't do that, but if you have it
6  from other source then, of course, you can tell
7  me or if somebody else was present.
8      A.  There was never anybody else
9  present.
10      Q.  Okay.  For example, I can, and I
11  will, and I do want to go through some of this,
12  but I'll come through this here.
13      (Defendant's Exhibit 32 was marked.)
14      Q.  Let me show you this.  It's a
15  little out of order, but if you would look,
16  it's an exchange between you and Tasha and it
17  relates to Mr. Diller.  Do you see that?
18      A.  Uh-huh.  Yes.
19      Q.  It would seem to indicate to me
20  that you had at that point, which I can't --
21  what's the day on there?  I'm sorry, I don't
22  have my copy of the e-mails.
23      A.  March 9.
24      Q.  So it's four days after you come
25  back from a March 5 meeting; correct?

Page 144

1      A.  Uh-huh.
2      Q.  And now Mr. Diller is going to be
3  your spokesperson with respect to going
4  forward; is that fair?
5      A.  Yes.
6      (Defendant's Exhibit 33 was marked.)
7      Q.  All right.  Let me show you what's
8  been marked as Exhibit 33.  This is a letter
9  that Mr. Diller sent to Mr. Breithaupt.  Do you
10  recall seeing that at or about the time?  It's
11  got you copied on the second page.
12      A.  I don't recall seeing it, but I'm
13  not saying I didn't.
14      Q.  All right.  The reason I asked you
15  about Western Extrusion, Arvin Mentior, and --
16      A.  Arvin Meritor.
17      Q.  Thank you.  And Sealco is because
18  they were mentioned in this letter.  Now as of
19  March 16, had you engaged Mr. Breithaupt to
20  represent you?
21      A.  I don't recall the date when we
22  engaged Mr. Breithaupt, but it was not too long
23  after the meeting of March 5.
24      Q.  At the bottom of this letter it
25  says, "Mark Wannemacher has also been contacted

Page 145

1  by one of the pension administrators about a
2  possible meeting to discuss this matter."  Who
3  was that?
4      A.  That was Don Sheetz.
5      Q.  Okay.  Did you ever have another,
6  I think you said you never had another
7  discussion with him?
8      A.  No.
9      MR. BREITHAUPT:  By way of
10  clarification, Clark, there was a meeting
11  subsequent to that letter at Tim Lupinacci's
12  office.  That's the meeting he talked about
13  earlier.
14      MR. HAMMOND:  But that was in April.
15      MR. BREITHAUPT:  Yes, a couple weeks
16  after that.
17      MR. HAMMOND:  Correct, but that was
18  in April after this.
19      MR. BREITHAUPT:  Right.
20      MR. HAMMOND:  I didn't know if he was
21  there or not, so that helps.
22      A.  Yeah, that's the meeting where we
23  really didn't have any discussion.
24      Q.  That's right.  All right.  Did you
25  ever have any discussions with David Neier,

37 (Pages 142 to 145)

Page 146

1  who's mentioned in here, of Winston and Strong?
2      A.  Just the discussion at that
3  meeting that we talked about here.
4      Q.  Okay.  Now why was it that Double
5  A felt like an involuntary petition was in
6  their best interests?
7      A.  Well, I would say from reading the
8  other depositions because the same reason
9  Dorsey felt filing bankruptcy sooner would have
10  been better, because it protected interests of
11  the parties involved at that point in time.
12      In other words, if I, if they file
13  a bankruptcy, it freezes everything at that
14  point so nobody can come in and take things,
15  which in my understanding is what happened when
16  they waited.  I mean, welders disappeared,
17  seems like materials disappeared from the
18  plant, all kind of things.
19      If it would have been an
20  involuntary, the court would have stepped in
21  and froze all of that, and my potential assets
22  or trailers or whatever you want to call them,
23  would have been safeguarded.
24      Q.  I noted in the first complaint you
25  filed you never sought to get any of the

Page 147

1  flooring aluminum.  Why is that?
2      A.  I really don't know.  I'm not sure
3  I told Diller about that right away.
4      MR. BREITHAUPT:  It's an honest
5  answer.  I never saw that document when I filed
6  the complaint.
7      Q.  It wasn't on your mind, was it?
8      A.  No, there were so many other
9  things on my mind at that point.  I probably,
10  you know, quite frankly, I forgot about it.
11      Q.  If you had truly bought that
12  499,000 pounds of material and you could get
13  your hands on it, that would have covered a lot
14  of debt, wouldn't it?
15      A.  Yes, but they wouldn't give it to
16  us.  When we asked them to load it, they
17  wouldn't do it.
18      Q.  But when you filed your complaint,
19  you didn't seek to try and have the court
20  compel them to turn over the goods that you had
21  urged?
22      A.  Well, at a certain point we did,
23  and they wouldn't do it.
24      Q.  Not the flooring aluminum?
25      A.  I think we asked for that also.

Page 148

1      Q.  In a conversation in January you
2  mentioned earlier?
3      A.  But I think that was part of our
4  proceedings in the court also in the filing
5  that we wanted all of our materials and all of
6  our parts, and they said that that aluminum
7  didn't belong to us, it actually belonged to
8  Fruehauf of Mexico.  In which case what they're
9  telling us is they told us a lie about who
10  owned the flooring.
11      Q.  Let's make sure we've got time
12  sequences correct.  The first group was
13  November 13?
14      A.  That's right.
15      Q.  Of '03, where you bought
16  499,000 pounds?
17      A.  We thought we bought
18  491,000 pounds.
19      Q.  That's right.
20      A.  That's right.  We thought we did.
21      Q.  That's what the deal said?
22      A.  Right.
23      Q.  We know it's not a pledge now, we
24  know it looks like it was a clear purchase;
25  right?

Page 149

1      A.  Right.
2      Q.  You didn't get your trailers?
3      A.  On time.
4      Q.  On time.  You went in January and
5  mentioned --
6      A.  I asked Chriss to load them on the
7  next completed trailer that we had come off the
8  line so we could bring them to Delphos.  He
9  refused to do that.
10      Q.  And instead of making him do that,
11  you very soon thereafter give them another
12  $659,000 for more trailers?
13      A.  I'm not exactly sure I hadn't
14  given them the $659,000 before I did that.  In
15  fact, I think I had.
16      Q.  Sometime around that period then?
17      A.  I think it was $659,000 before the
18  request.
19      Q.  And so you made the request and
20  they refused it?
21      A.  Yes.
22      Q.  And then after that, you gave them
23  another 404?
24      A.  No.
25      Q.  You didn't ever give them another

38 (Pages 146 to 149)