UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                        )
                                              )      Jointly Administered
FRUEHAUF TRAILER CORPORATION,  )
et al.,                                       )      Case No. 96-1563 (PJW)
                    Debtors.                  )      Chapter 11
                                              )
                                              )
                                              )
                                              )

## PRELIMINARY AND FIRST REPORT OF DANIEL W. HARROW, RECENTLY APPOINTED SUCCESSOR TRUSTEE OF THE END OF THE ROAD TRUST

### BAKER & McKENZIE LLP

Ali M.M. Mojdehi
Janet Dean Gertz
101 West Broadway, 12th Floor
San Diego, CA 92101
(619) 236-1441

Attorneys for the End of the Road Trust as
successor to Debtors and Debtors in Possession

Dated: San Diego, California
       March 14, 2006

SDODMS1/658606.13

Double A 0640


EXHIBIT
69

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT AND OVERVIEW CONCERNING
      ADMINISTRATION OF THE END OF THE ROAD TRUST, 1998-2005..................... 1

II.   BACKGROUND ..................................................................................................... 3

      A.    The Dual Structure of the Trust: Dual Beneficiaries ............................................ 3

            1.    The Liquidating Trust ............................................................................. 5

            2.    Operating and Holding Companies Owned by the Trust........................... 5

            3.    The Pension Transfer Corporation: Special Purpose Entity Created
                  Solely to Sponsor the Fruehauf Trailer Corporation Employee
                  Pension Plan........................................................................................... 6

      B.    The Many Hats Worn by Street ........................................................................ 13

            1.    Chriss William Street............................................................................. 13

            2.    Chriss Street, The Liquidating Trustee .................................................. 15

            3.    Chriss Street, Officer & Director of Trust Entities ................................. 15

            4.    Chriss Street, Employee......................................................................... 15

            5.    Chriss Street, Owner of Chriss Street & Co., Street Asset
                  Management, LLC, & Street Asset Management.................................... 16

III.  ASSETS & LIABILITIES: MANAGEMENT OF THE TRUST'S BALANCE
      SHEET .................................................................................................................. 18

      A.    Overview............................................................................................................ 18

      B.    Specifics............................................................................................................ 20

            1.    Assets................................................................................................... 20

            2.    Liabilities ............................................................................................. 27

IV.   SIGNIFICANT TRANSACTIONS UNDERTAKEN BY STREET ON BEHALF
      OF THE TRUST AND ITS RELATED ENTITIES: A RECURRING PATTERN
      OF CONFLICTS OF INTEREST............................................................................. 29

      A.    Sale of Jacksonville Note by the Trust to the Pension Plan................................. 29

      B.    Purchase of American Trailer Inc ...................................................................... 30

Double A 0641

**TABLE OF CONTENTS**
(continued)

Page

C.  Purchase of Dorsey by the Pension Plan.................................................... 32

V.  TRUST ADMINISTRATION AND CORPORATE GOVERNANCE:  THE
    PATTERN OF MISMANAGEMENT AND SELF DEALING REPEATS ................... 35

    A.  Corporate Governance of the Trust and Entities Related to the Trust................ 35

        1.  U.S. Holding Company.......................................................... 35

        2.  Pension Transfer Corp .......................................................... 36

        3.  American Trailer Inc............................................................ 36

        4.  Other Special Purpose Entities................................................ 37

        5.  The End of the Road Trust..................................................... 37

    B.  Tax Returns, Audits, and Accounting.................................................. 38

        1.  Tax Filings ...................................................................... 38

        2.  Audits & Accounting ........................................................... 41

        3.  Records Management........................................................... 42

    C.  Insurance coverage....................................................................... 43

    D.  Payments and/or Gifts Made to Third Parties by the Trust and/or Its
        Related Entities........................................................................... 44

        1.  James Wong/Stanford University ............................................ 44

        2.  Books for Freedom .............................................................. 45

        3.  Corona Del Mar Water Polo Tournament.................................. 45

    E.  Questionable Transactions Made by Street.......................................... 46

        1.  Office Space, Administrative Services ...................................... 46

        2.  Compensation of Consultants ................................................. 47

        3.  Compensation of Chriss Street by the Trust and its Related Entities...... 49

        4.  Compensation Received from Dorsey ....................................... 51

Double A 0642

# TABLE OF CONTENTS
(continued)

Page

|   | 5. | Compensation of Vicky Street by the Trust and its Related Entities....... 52 |
|---|----|------|
|   | 6. | Expense Reimbursements of Chriss Street ............................................... 54 |
| VI. | CONCLUSION.............................................................................................................. 58 |

SDODMS1/658606.13

Double A 0643

I.

## PRELIMINARY STATEMENT AND OVERVIEW CONCERNING ADMINISTRATION OF THE END OF THE ROAD TRUST, 1998-2005

Mr. Daniel W. Harrow, the successor Trustee (the "Successor Trustee") of The End of the Road Trust, (the "Trust"), successor in interest to Fruehauf Trailer Corporation, Maryland Shipbuilding & Drydock Company, F.G.R. Inc., Jacksonville Shipyards, Inc., Fruehauf International Limited, Fruehauf Corporation, The Mercer Co., Deutsche-Fruehauf Holding Corporation, MJ Holdings, Inc., and E.L. Devices, Inc. (collectively, "Fruehauf" and/or "Debtors"), hereby submits this Preliminary and First Case Status Report (the "Report") concerning the administration of the Trust from 1998 through 2005. This Report is submitted pursuant to the request of the United States Trustee and pursuant to the reporting requirement contained in the Liquidating Trust Agreement dated October 27, 1998 (the "Trust Agreement").[1]

The statements and conclusions in this Report have not been adopted or accepted by the Court and constitute only the opinions of the Successor Trustee. No portion of this report has been admitted into evidence. The publication of this Report is without prejudice to the right of any party to challenge the statements contained in this Report.

In summary, the trusteeship of the Trust by the former trustee, Mr. Chriss W. Street ("Street") appears, upon close examination, to be a story of mismanagement, conflicts of interest, and greed. The numbers speak for themselves. The Trust corpus appears to have originally amounted to approximately $24 million in assets.[2] Approximately $11 million was distributed to the beneficial interestholders. By comparison, *at least* $11.7 million appears to have been

---

[1] Most recently, the Office of the U.S. Trustee again requested a report regarding the progress of this case, "given the age of the case and replacement of the . . . Trustee in August of 2005."

[2] Excluding unliquidated, contingent claims against third parties assumed by the Trust as successor in interest to the Debtors.

Double A 0644

consumed in Trust overhead and expenses.[3]  During this time, Street and his wife, Victoria Cox Street, collectively drew a total salary of approximately $2.06 million from the Trust and its associated entities.[4]

Rather than fulfilling his responsibility to liquidate the assets of the Trust, Street utilized the Trust and its assets as a means to finance ill-conceived new business ventures.  Street used Trust assets to make repeated acquisitions of operating companies, which themselves were in bankruptcy, each of which ultimately failed under his management.  Furthermore, Street regularly appeared on "both sides" of financial transactions involving the Trust or its assets, tainting these transactions with the appearance of, if not an actual, conflict of interest and the potential for self dealing.  Street, whose compensation structure was already decidedly generous, may have abused his trust by utilizing his office for his own personal aggrandizement.  Unfortunately, although the Successor Trustee is still reviewing the facts under the pertinent circumstances, the record and the evidence suggest that the tenure of Street in his role as the trustee of the Trust and officer and/or director of the associated entities was characterized by this repeating theme.

Indeed, Street's management appears to have wrought serious economic damage on the Trust and its directly and indirectly owned assets as well as on the former Fruehauf Trailer Corporation Employees' defined benefit pension plans (collectively, as consolidated, the "Pension Plan"), which the Trust indirectly sponsored.  Although the Successor Trustee is moving quickly to correct the deficiencies in the administration of the Trust, the Trust's assets

---

[3] These numbers represent only an accounting for Trust assets, which, as explained below, excludes any accounting concerning the assets and operating expenses of the Pension Plan.

[4] Excluding expenses reimbursed to Street by FdM and management fees paid by the Pension Plan to Chriss Street & Company and Street Asset Management, LLC.

Double A 0645

are likely to remain burdened by the unfortunate legacy of Street's actions for the foreseeable future.

The Successor Trustee is currently attempting to resolve and mitigate the effects of, *inter alia*: (i) ongoing government investigations into potential improprieties and breach of duty by Street involving the Trust and its related entities; (ii) potential tax and accounting improprieties concerning the Trust and its related entities, including Street's questionable treatment of certain related party transactions; (iii) severe disarray in the business records and mismanagement of the corporate governance of the Trust and its directly and indirectly owned entities; (iv) possible forfeiture and/or misappropriation of Trust assets; and (v) Street's creation of contingent liabilities and/or legal or equitable claims by third parties against the Trust and/or its assets.[5]

## II.

## BACKGROUND

### A.    The Dual Structure of the Trust: Dual Beneficiaries

The essential structure of the Trust, and the related roles held by Street, by their very nature, implicated conflicts of interest and the potential for breach of fiduciary duty and his respective duties of loyalty. This Trust was very different than most. Its structure implicated two discrete sets of beneficiaries: (i) the beneficiaries of the *Trust*, and (ii) the beneficiaries of the *Pension Plan* for which a subsidiary of the Trust acted as the sponsor.

The basic structure of the Trust and its entities, the relationship of the Trust to the Pension Plan, and the relationship to Street's investment advisory business, is outlined below.

---

[5] The Successor Trustee believes that further examination of Street is required concerning these events, as are more specifically set forth in the following Report. Unfortunately, the Successor Trustee's Rule 2004 examination of Street was prematurely terminated by Street after only two days of deposition testimony. The Successor Trustee therefore intends to file a motion with this Court for an order compelling further testimony by Street.

Double A 0646

## CORPORATE STRUCTURE



Unfortunately, Street does not appear to have kept the interests of these two separate sets of beneficiaries separate and apart, as was necessitated under his fiduciary duty, duty of loyalty, and duty of good faith owed to each set of beneficiaries. *Cf. Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156 (Del. 1995). Not only did Street make transactions between the Trust's direct and indirect subsidiaries and the Pension Plan, which was sponsored indirectly by the Trust, but Street, by virtue of his many and varied roles in positions of direct or indirect control of both the Trust and the Pension Plan and entities owned by The Trust and the Pension Plan, often ended up on "both sides" of these transactions. Adding further to the ethical complexity of these transactions was the fact that Street also acted in many instances on behalf of, and for the benefit of, his own business entity, Street Asset Management, LLC.[6]

---

[6] Except under narrowly prescribed circumstances, usually requiring advance judicial approval, a trustee is flatly prohibited from having personal dealings with his trust or benefiting in any way from transactions involving trust

SDODMS1/658606.13

Double A 0647

1.    **The Liquidating Trust**

The Trust, successor in interest to the Debtors, was formed out of the Debtors' Amended

Joint Plan of Reorganization (the "Plan") by virtue of the Trust Agreement.  Under the Plan, all

the remaining assets of the Debtors were to be conveyed to the Trust "for the benefit of the

creditors" who received a beneficial interest in the Trust.  The creation of a liquidating trust

under the Plan was for purposes of "an orderly liquidation of the Debtors' remaining assets" by

the Liquidating Trustee."  Findings of Fact and Conclusions of Law Regarding Order and

Judgment Confirming the Debtors' Plan ¶11 (hereinafter, "Findings of Fact and Conclusions of

Law").  The Trust Agreement regulates the investments that can be made by the Trustee and

expressly precludes any lending of money by the Trust to any third party.

2.    **Operating and Holding Companies Owned by the Trust**

The Successor Trustee is informed and believes that upon confirmation of the Plan,

Camhy, Karlinsky & Stein LLP, then counsel to the Trust, initially set up six special purpose

entities.  These entities were wholly owned by the Trust and created to hold the remaining assets

of the Debtors that were transferred to the Trust pursuant to the Plan.  The entities were: (i) JSI

Property Corp.; (ii) Hogan's Creek Realty, Inc.; (iii) Picketsville Realty, Inc.; (iv) Mayport

Realty Inc.; (v) JSI Lexington Realty Inc.; and (vi) FrudeMex, Inc. (hereinafter, the "U.S.

Holding Company"), a holding company formed for the sole purpose of holding the shares of a

Mexican operating company, Fruehauf de Mexico, S.A. de C.V. (hereinafter, "FdM").[7]  Later, in

October, 1999, another wholly-owned entity of the Trust, ATM Acquisition Corp., n/k/a

---

property, even where such transactions are indisputably in the best interests of the trust estate.  *See* 3 Pomeroy
Equity Jurisprudence § 958 (5th Ed., 1941); *see also Stegemeier v. Magness*, 728 A.2d 557 (Del. 1999).
[7] FrudeMex, Inc. underwent numerous name changes and changes in its corporate form.  This entity is currently
known as American Trailer Industries, Inc.  Due to the similarity in name to American Trailer, Inc., an operating
company which was also owned by the Trust, the American Trailer Industries, Inc. holding entity is referred to
herein simply as the U.S. Holding Company.

Double A 0648

American Trailer, Inc. (hereinafter, "American Trailer") was created by Street for the purpose of acquiring the assets of a bankrupt trailer manufacturer.

As stated above, Street generally controlled the management of each of these seven entities by virtue of his position as sole director and/or officer positions in these entities. It was therefore incumbent upon Street, by virtue of his fiduciary duty in his position as Trustee and as officer and/or director of these seven entities, to manage the entities and the assets held by these entities, for the benefit of the sole shareholder, the Trust, and ultimately for the beneficiaries of the Trust, the former creditors of the Debtors.

### 3. The Pension Transfer Corporation: Special Purpose Entity Created Solely to Sponsor the Fruehauf Trailer Corporation Employee Pension Plan

#### a. *Background*

One additional special purpose entity wholly owned by the Trust was created upon the Effective Date of the Plan, known as Pension Transfer Corporation ("PTC"). PTC was created to facilitate the ongoing sponsorship and administration[8] of the Pension Plan which obligation and structure was imposed pursuant to the Plan. ERISA places broad duties on the plan fiduciary to administer the plan for the exclusive benefit of its participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1)(A)(i), (ii). As such, Street was required by law to ensure that a "firewall" separated the Pension Plan and its assets from the Trust and its assets.

Ongoing sponsorship of the Pension Plan by the Trust was apparently necessitated because of the legacy of the claims filed by the Pension Benefit Guaranty Corporation ("PBGC") against the Pension Plan in each of the Debtors' bankruptcy cases. Under the Debtors' Plan, the

---

[8] Under ERISA the term "plan sponsor" means (i) the employer in the case of an employee benefit plan established or maintained by a single employer, (ii) the employee organization in the case of a plan established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan. 29 U.S.C. § 1102.

SDODMS1/658606.13

Double A 0649

claims of the PBGC were not released or discharged; rather, they were withdrawn based upon the transfer of "sponsorship of the pension plans . . . and the pension plans remain[ing] ongoing after confirmation of the Plan." Findings of Fact and Conclusions of Law ¶ 13. As such, unlike the other six wholly-owned entities of the Trust, which existed for the benefit of the former creditors of the Debtors who became Interestholders, the PTC existed instead for the benefit of the former employees of the Debtors who were beneficiaries of the Pension Plan.

Upon the Effective Date of the Plan, Street controlled the management of Pension Plan's sponsor, PTC, having been appointed as its sole Director as well as Chief Executive Officer and President. Later, in July 2002, upon the resignation of Kenette Canary, Street also became the Secretary of the PTC.[9] The PTC set up a Pension Administrative Committee ("PAC"), which appears to have served as the decisionmaking body concerning the administration of the Pension Plan and the investment of the Pension Plan's assets. According to Street's testimony, the PAC was formed to "pay beneficiaries . . distribute funds . . . invest funds [and] to comply with the responsibilities of the pension plan." *See* Transcript of Videotaped Deposition of Chriss W. Street, January 17-19, 2006, at 79-80 (hereinafter, "Transcript"), attached hereto as Exhibit "A."

It is a reasonable inference that Street obtained virtual, if not actual, control over the PAC during much of his tenure as Trustee. The minute books of the PTC indicate that all members of the PAC were appointed by Street, in his capacity as Sole Director of the PTC. Although the minute books of the PTC are missing the records from this period of time, an undated report contained in the End of the Road Trust Reference Manual indicates that Chriss W. Street, along with Trust employees Courtney Watson, Worth Frederick, and James Wong comprised the initial

---

[9] The minute books of the PTC in possession of the Trust are incomplete and do not include the bylaws or minutes prior to May 2001. This information has been extracted instead from the Statements of Information filed with the State of California by Street in 2001 and 2004.

-7-

Double A 0650

PAC. Later, the members of the PAC appear to have been comprised of individuals associated with a pension consulting firm formerly known as The Resource Partnership, now known as The Human Resource Partnership, L.L.C.

At some point in time prior to May 24, 2001, the then-existing members of the PAC resigned, and Street's business partner, Mr. Donald Sheetz, was appointed by Street to serve on the PAC, in which capacity he served until his resignation from the PAC on March 30, 2005. Trust employee Worth Frederick served along with Mr. Sheetz on the PAC from May 24, 2001 until December 31, 2004, when Mr. Frederick resigned.

According to the Form ADV filed by Street Asset Management LLC with the Securities & Exchange Commission website, beginning in September 2001, Mr. Sheetz was a member and control person of Street Asset Management LLC. *See* Securities & Exchange Commission, Investment Advisor Public Disclosure, CRD No. 112378 *at* http://www.adviserinfo.sec. gov/IAPD/Content/ViewForm/ADV/Sections/iapd_ADVIdentifyingInfoSection.aspx (last visited February 27, 2006) (hereinafter, "SAM Form ADV"). During this time, Mr. Sheetz voted on, *inter alia*, the investment strategy and allocation of the Pension Plan assets.[10]

Although Street in his deposition attempted to distance himself from the decisions and activities of the PAC, testifying that he only attended "very few" of the PAC meetings, Transcript at 705, Street otherwise appears to have been intimately involved in the meetings and decisions of the PAC. For example, the PTC minute books in the Trust's possession reveal that Street appears to have attended meetings frequently "by invitation." Furthermore, most, if not all, investment allocation decisions of the Pension Plan appear to have been routinely presented

---

[10] According to the SEC filing, the other control persons of Street Asset Management, LLC were Chriss Street, Victoria Cox Street, Kurt Stabel, and Raymond Pentz. *See* SAM Form ADV.

SDODMS1/658606.13

Double A 0651

to Mr. Street for his "consideration" and ultimate approval. *See* PTC Minute Book, Investment Notes dated Week of December 3, 2001.

Upon its formation, the PAC almost immediately retained Street's firm, Chriss Street & Company, later known as Street Asset Management, LLC as an "advisor" to the Pension Plan. Chriss Street & Company was chosen as an advisor, although Chriss Street & Company had only recently received its registration as an investment advisor from the Securities & Exchange Commission and had no prior experience managing any investment funds for third parties. Transcript at 14.[11]

A question arises whether the investment of such a substantial portion of the Pension Plan assets would have been entrusted to Street Asset Management absent Street's appointment as Trustee of the Trust. Although Street testified that his related entities managed "more than 25 percent, [but] less than 50 percent" of the Pension Plan's assets, Transcript at 82, this statement is belied by the record reflected in the PTC minute books. Rather, Chriss Street & Company, and later Street Asset Management, LLC appear to have managed the majority of the Pension Plan assets. For example, as of December 2001, the "Investment Notes" published by the PAC showed a total investment portfolio for the Pension Plan of $57.2 million. Of that, Street Asset Management, LLC managed $15.5 million in stocks, $15.5 million in bonds, as well as $6.2 million that had been invested in an asset known as the Jacksonville Note, resulting in a total of $37.2 million under management by Street Asset Management. This amount represented fully 65% of the Pension Plan investment portfolio.[12] Furthermore, if one also includes the $5.7

---

[11] As stated above, the minutes of the PTC prior to May 24, 2001 are missing. As such, it is impossible to determine the exact mechanics of the decision to retain Chriss Street & Company and/or who constituted the members of the PAC at this date. The Trustee plans on issuing subpoenas to obtain this information.

[12] The remainder of the portfolio was comprised of $1.7 million held in cash, $5.7 million invested in the Dorsey Trailer entity, and $12.6 million was otherwise invested with the PIMCO bond fund.

Double A 0652

million that was then invested in Dorsey Trailer, Inc. ("Dorsey") (which investment Street orchestrated and appeared to have had virtual control), Street Asset Management had investment control over 75 percent of the Pension Plan assets.

The Successor Trustee is currently reviewing the investment track record of Chriss Street & Company and Street Asset Management for the performance of the Pension Plan assets under their management vis-à-vis similar investments. In addition, the Successor Trustee is investigating the management fees charged to the Pension Plan by Chriss Street & Company and Street Asset Management; in particular, whether these fees were both reasonable and market based.

        b.    *Department of Labor and Pension Benefit Guaranty Corporation Investigations*

The Department of Labor ("DOL") and the Pension Benefit Guaranty Corporation ("PBGC") have collectively initiated several investigations against Street, Chriss Street & Co., Street Asset Management, the Trust, and its related entities related to actions involving the Pension Plan. The Successor Trustee is aware of at least *six* such investigations into potential ERISA violations as follows:

- A DOL investigation relating to the Trust's sale of the Jacksonville Note asset from the Trust to the Pension Plan.

- A DOL investigation relating to Street's sale of the shares of Maxicare to the Pension Plan.

- A DOL investigation in 2001 into the acquisition of Dorsey, a bankrupt entity, by the Pension Plan, as well as inquiry into service providers to the Pension Plan,

SDODMS1/658606 13

Double A 0653

including DAVRIC and The Resource Partnership, and further inquiry into the sale of the Jacksonville Note and Maxicare stock to the Pension Plan.

- A DOL investigation in 2004 into the status of the Pension Plan in light of, *inter alia*, the bankruptcy of its wholly-owned asset, Dorsey, leading to a recommendation by the DOL in July 2004 for the appointment of an independent fiduciary.

- A PBGC investigation and Notice of Determination dated August 12, 2004, as a result of which the oversight of the Pension Plan was transferred to Fiduciary Counselors, Inc. pursuant to an agreement of that same date between Fiduciary Counselors, Inc. and the PTC. In October 2004, transfer of the sponsorship of the Pension Plan to the PBGC was effected under an Agreement for the Appointment of Trustee and Termination of the Pension Plan.

- In October 2005, the DOL issued a subpoena to the Trust, pursuant to an investigation seeking information concerning, *inter alia*, the Pension Plan; the Trust and its related entities (including FdM); Street; Street's affiliated entities; the Dorsey acquisition; and subsequent transactions by and among the Trust, its related entities, and the Dorsey entity.

The Successor Trustee is informed and believes that the majority of these investigations are still pending. The Successor Trustee is also informed and believes that Street, certain members of the PAC, as well as the PTC have entered into one or more tolling agreements with the DOL. With respect to the most recent DOL investigation initiated in October 2005, the Successor Trustee is in the process of complying with a subpoena issued to the Trust and its

Double A 0654

related entities. In this respect, the Successor Trustee continues to produce documents that are responsive to the subpoena and is otherwise providing information as it becomes available.

       c.     *PBGC Assumption of the Sponsorship of the Pension Plan*

When queried about the circumstances of the transfer of the Pension Plan sponsorship to the PBGC in October 2004, Street testified that the transfer was "by mutual agreement" and entirely voluntary. Transcript at 18. Street stated that the Pension was voluntarily turned over to the PBGC because the Trust "didn't have a continuing business to support the [Pension] Plan." *Id.* The Successor Trustee is informed and believes, however, that the Trust only indirectly sponsored the administration of the Pension Plan and was never intended to "support" the Pension Plan, which was intended to be self-sustaining. Rather, the assets of the Trust and the Pension Plan were required by law to be kept entirely separate. The Successor Trustee is informed and believes that sponsorship of the Pension Plan was transferred to the PBGC because the PBGC was concerned about the safety of the Pension Plan assets and their investment.

The PBGC Notice of Determination stated that "the [Pension] Plan *must* be terminated in order to protect the interests of the [Pension] Plan's participants and that the [Pension] Plan *must* be terminated in order to avoid any unreasonable deterioration in the financial condition of the [Pension] Plan" (emphasis added). The letter from the PBGC accompanying the Notice of Determination stated that termination could be accomplished by agreement or by court order. The PBGC auditor continued that "[w]e would prefer to terminate the [Pension] Plan by agreement in order to avoid the expense and delay of litigation." As such, the transfer of the Pension Plan to the PBGC was far from "voluntary."

Street testified that at the time he had assumed his role as trustee, the Pension Plan corpus was approximately $100 million and the Pension was "over funded." Transcript at 30, 31, 147.

-12-

Double A 0655

By the time the PBGC had taken over the Pension Plan in October 2004, the assets were approximately $50 million, and the PBGC estimated the Pension Plan to have a $7 million underfunded status. Transcript at 30-31, 148.[13]

**B.     The Many Hats Worn by Street**

Prior to the takeover of the Pension Plan by the PBGC in October 2004, Street held positions affecting the interests of both sets of beneficiaries, *i.e.*, with respect to the Trust and its entities as well as with respect to the Pension Plan and its wholly owned entities.

**1.     Chriss William Street**

Street describes himself as having "thirty years of experience in money management, investment banking, and operations restructuring." *See* Street Asset Management, LLC, Registered Investment Advisor, at http://www.streetassetmanagement.com/who.html (last visited January 16, 2006).[14] Many of these years appear to have been spent working as a stockbroker or managing his own investment portfolio.

Street graduated from the University of California, [Irvine], in 1977. Transcript at 8. After completing his undergraduate work, he "worked for several brokerage firms." Transcript at 1:9. After taking a brief break to attend a certificate program at Stanford in 1990, he started his own firm, Chriss Street & Company, where he "manag[ed] his own money." *Id.* at 8-10. From approximately 1994-2000 Street served on the board and was an officer of Comprehensive Care Corporation, apparently primarily engaged in the sale of its non-continuing operations. He described this position as part-time. *Id.* 1:10, 13.

---

[13] This underfunding equated approximately to the amount which had been invested, and lost, in the Dorsey acquisition discussed *infra* Section IV.C.
[14] As noted below, Street Asset Management, LLC is no longer a registered investment advisor.

Double A 0656

In 1996, following the filing for bankruptcy of the Debtors, Street became one of two members of the board of the Debtor Fruehauf Trailer Corporation. Street became its President and CEO in 1997. The Successor Trustee is informed and believes that at that time, the Debtor was substantially liquidated and had only six employees, the majority of whom had previously worked with Street at Comprehensive Care Corporation.[15]  In addition to his $270,000 annual compensation as Chairman, President and CEO, Street received a $350,000 "bonus" on the Effective Date of the Plan.

In 1998, Street was installed as the liquidating trustee of the Trust by virtue of the Plan, which was to be effectuated by the liquidation of Debtors' remaining assets, bringing with him Worth Frederick, James Wong, and Courtney Watson, who served as members of the PAC as well as employees of the Trust and its associated entities. Street served as Trustee from October 27, 1998 until August 1, 2005, at which time he was replaced by the Successor Trustee pursuant to this Court's *nunc pro tunc* Order dated August 18, 2005.

Street states that as of the date of his termination of employment with the Trust, he is "retired," with no current employment. Transcript at 15-17. The Successor Trustee is informed and believes, however, that Street has recently been appointed as the Assistant Treasurer of Orange County, California is actively running for the elected office of Treasurer of Orange County, California.[16]

---

[15] Worth Frederick, Courtney Watson, and James Wong were each later employed by the Trust and served on the PAC.

[16] *See* Registrar of Voters, County of Orange, Campaign Finance Disclosures *at* http://www.ocgov.com/election/candidate/disclosure.htm (last visited March 1, 2006). Mr. Street is being promoted as the current President, Chairman, and CEO of Fruehauf Trailer Corp. *See* http://www.streetfortreasurer.com.

SDODMS1/658606.13

Double A 0657

## 2.    Chriss Street, The Liquidating Trustee

Street was installed as the trustee of the Trust in October 1998, upon confirmation of the Plan. Under the Trust Agreement, the "sole purpose [of the Trust is] conserving and liquidating the Trust Estate for the benefit of the Beneficial Interestholders . . . with no objective to engage in the conduct of a trade or business." As such, the Trustee was to "dispose of the Trust Estate, and to distribute the net proceeds . . . in as *prompt, efficient and orderly a fashion* as possible" (emphasis added).

For his services in liquidating the Trust, Street was to receive a base salary amount of $200,000 per year, plus a performance bonus for distributions in accordance with a set formula. Almost eight years later, the Trust corpus is still unliquidated.

## 3.    Chriss Street, Officer & Director of Trust Entities

Street installed himself on the boards and/or as officer of each of the entities owned directly and indirectly by the Trust. For example, the books and records of the Trust indicate that as of June 1, 2001, Street was President of the U.S. Holding Company, Harrisburg Realty, Inc., Hogan's Creek Realty, Inc., JSI Lexington Holdings, LLC, and the PTC. Additionally, Street was "temporary President" of American Trailer until December 7, 2000. Street also appears to have served as Sole Director of each of the entities owned or controlled by the Trust.

## 4.    Chriss Street, Employee

Street appears to have entered into two employment agreements as a result of his trusteeship. First, Street entered into an agreement with the Trust for services as Trustee of the Trust, for which he was to receive $200,000 per year. This appears to have been a part-time position. Street would not testify that he spent at least 20 hours per week on the management of

-15-

Double A 0658

the Trust. He would only testify that he spent "on average more than ten hours a week" during the period 1998 through 2005. Transcript at 60-61.

Second, Street entered into an agreement with the U.S. Holding Company for services as "Chairman of the Board and Chief Executive Officer," for which he was to receive base compensation of $50,000 per year, plus certain "fringe benefits." The corporate resolutions of the U.S. Holding Company show that although Street does appear to have served on the board of that company, it is not clear that he ever actually served as its Chief Executive Officer. Indeed Street testified that he was never an officer of the U.S. Holding Company, merely the sole director. Transcript at 268:11-22. Furthermore, the records of the U.S. Holding Company's wholly-owned subsidiary, FdM, indicate that Street only very briefly served as an employee of FdM. Nonetheless, Street's receipt of the base salary and "perquisites" under the employment agreement with the U.S. Holding Company was continuous.

Street executed the employment agreement with the U.S. Holding Company in his personal capacity as employee and, purportedly, on behalf of the U.S. Holding Company. The employment agreement with the U.S. Holding Company, unlike the Trust Agreement, was not attached to the Plan and only recently was produced by Street in response to a subpoena for documents issued by the successor Trustee.

### 5.    Chriss Street, Owner of Chriss Street & Co., Street Asset Management, LLC, & Street Asset Management

As stated above, in approximately 1991, Street had formed Chriss Street & Company to "manage [his] own money." Transcript at 9-10. Although the Debtors' Disclosure Statement describes Chriss Street & Company as "specializ[ing] in the securities of troubled companies," Chriss Street & Company did not receive its registration as an investment advisor, and thus was precluded from managing money for investors, until 1999. Transcript at 14.

-16-

Double A 0659

In 2000, Chriss Street & Company "was chosen [by the PAC] to manage the Fruehauf Trailer Pension Plan." Transcript at 15. According to Street, approximately nine months later, Street Asset Management, LLC became a registration successor to Chriss Street & Company and, as a result, the contract to manage the funds of the Pension Plan "was transferred to Street Asset Management, LLC." Transcript at 5-16. Street Asset Management, LLC was owned by four individuals, Chriss Street, Donald Sheetz (also a member of the PAC), Kurt Stabel (also an employee of the U.S. Holding Company), and Raymond Pentz. *See* SAM Form ADV.[17]

The Pension Plan appears to have been the sole source of income for Street Asset Management, LLC, which had *no other clients*. In his testimony, Street indicated that the Pension Plan amounted to "over 90 percent" of all the accounts managed by Street Asset Management, LLC, leaving the inference that the entity may have, at one time or another, served other clients. Transcript at 82-83. The form filed by Street Asset Management, LLC with the Securities & Exchange Commission on June 23, 2004, however, discloses that: Street Asset Management had only one account, the management of $26,693,074 for "a Pension and profit sharing plan[ ]," *i.e.*, the Pension Plan. *See* SAM Form ADV.

The partners of Street Asset Management, LLC, appear to have become embroiled in a partnership dispute in early 2003, after Messrs. Pentz and Stabel had "provided [Pension Plan] documents to 'third parties' such as the Orange County papers." PTC Minute Books, Memorandum dated April 22, 2003. The PAC instituted litigation and the Pension Plan funded this litigation against Street's former partners, which was for the purported purpose of "prevent[ing] further loss of and dissemination of the Plan's documents." *Id.* The attorney chosen to litigate the matter for the Pension Plan was Mr. Darryl Sheetz, brother of PAC member

---

[17] The Successor Trustee is informed and believes, however, that Street personally received all income from the entity's only client, the Pension Plan.

Double A 0660

Donald Sheetz (also a member of Street Asset Management, LLC). According to the minutes of the PAC, Darryl Sheetz was chosen "because he was familiar with the situation." *Id.* The Successor Trustee is continuing his investigation of this matter to determine if the PTC may have inappropriately funded the litigation of Street's personal dispute with his former partners.

The practical business existence of Street Asset Management, LLC appears to have ended when, as is discussed below, the PBGC took over the sponsorship of the Pension Plan in October 2004. Street testified that Street Asset Management, LLC is no longer active, that its SEC registration was ceded to Street Asset Management[18] and that currently "only Street Asset Management is active in the form of looking for clients." Transcript at 307-308.[19] Although according to the SEC website, the registration status for Street Asset Management, LLC has indeed been terminated, the Successor Trustee has been unable to find any record of an SEC registration for "Street Asset Management," its purported registration successor.

## III.

## ASSETS & LIABILITIES: MANAGEMENT OF THE TRUST'S BALANCE SHEET

### A.    Overview

Street testified that he was the person with primary responsibility for the administration of the Trust and its assets. Transcript at 57. As a threshold matter, the assets of the Debtors that were transferred to the Trust appear to have been mismanaged or at least ignored by Street. This reality is reflected by the simple fact that Street appears to have never created a simple balance sheet, and/or was generally not familiar with the details concerning the assets and liabilities of the Trust. Furthermore, Street does not appear to have requested professionals to set forth this

---

[18] Street Asset Management is a California Corporation incorporated on October 25, 2004, shortly after the PBGC took over the sponsorship of the Pension Plan. Chriss Street is the only known officer and director.

[19] Street could not explain why the website for Street Asset Management, LLC is still active.

Double A 0661

important data. Street testified that all audits of the Trust ceased in "2001 or 2002" because "we didn't have the money financially to continue the audits." Transcript at 163. When queried, Street could not identify any specific writing that would have contained a current and updated list of the assets and liabilities of the Trust that would have existed as of the date of his departure, except for a "spreadsheet" that he alleged was kept in a binder, and perhaps might have been kept in electronic form on the computer systems of the Trust. Transcript at 118.

To date, the Successor Trustee is still attempting to locate the "spreadsheet" that Street referred to, but has been able to locate only a skeletal, out of date, and incomplete list of assets of the Trust, which appears to have been last updated shortly after Plan confirmation. It therefore appears that the most complete and detailed list of assets and liabilities of the Trust is to be found in the original list of those assets and liabilities from eight years ago that is contained in the Debtors' Amended Disclosure Statement dated July 28, 1998 (the "Disclosure Statement").

Based on the Successor Trustee's best assessment, the following is a status of the Trust assets at inception in October 1998, and currently:

| Value As of Inception in October[20] | Current Status |
| --- | --- |
| Cash: $4.6 million | $0 |
| Real Estate: valued on books at $326,000 | One parcel sold for $34,000, and proceeds distributed<br>Others may have escheated due to non-payment of property taxes |
| Jacksonville Note: $6.4 million | Sold to Pension Plan for $6.3 million, $6.16 million distributed |
| Kearny Note: $2.371 million | Sold for $1.4 million, $1.02 million distributed |
| Terex Litigation: Unknown Value | Settled for approximately $4 million and proceeds distributed |
| Miscellaneous Claims and Avoidance Actions: Unknown Value | May have been waived for failure to prosecute |
| Fruehauf de Mexico: $6.4 million book value | Unliquidated<br>Possibly encumbered |

---

[20] Values obtained from 1999 General Ledger of the Trust.

SDODMS1/658606.13

Double A 0662

| Value As of Inception in October[20] | Current Status |
|---|---|
| | $2.8 million in cash extracted for Dorsey operating expenses |
| | Unknown amounts of cash extracted for overhead of the Trust and its subsidiaries |

According to records that are in the Successor Trustee's possession, the total distributions made to bondholders from 1998-2005 was approximately $11 million. This amount roughly equates to the value of the Jacksonville Note, the Kearny Note, and the Terex Settlement. By comparison, a sum total of at least $11.7 million (including $6.6 million of working capital extracted from FdM to be used for Trust and Dorsey overhead expense) appears to have been consumed in operating this liquidating Trust, which appears to have done very little liquidating of assets.

## B.    Specifics

Utilizing the asset information contained in the Disclosure Statement as a reference point, Street responded to specific queries about the current status of the Trust balance sheet as follows:

### 1.    Assets

#### a.    *Cash & Securities*

According to the Disclosure Statement, the Trust received substantial amounts of cash upon Plan confirmation. Street was unable to account for the disposition of this cash, except to state that it "was either distributed or used for operations." Transcript at 85, 164. In any event, Street testified that the Trust had run through most of its cash by 2001 or 2002. Transcript at 163. The Successor Trustee is informed and believes that the Trust received an approximately $4.6 million cash opening balance. None of this cash appears to have been distributed, but appears to instead have been consumed by overhead and expenses.

SDODMS1/658606 13

Double A 0663

In addition, the Disclosure Statement indicated that certain shares of Wabash stock were to be transferred to the Trust. It appears as though the Wabash stock was initially distributed to the bondholders and never placed on the balance sheet of the Trust. Street was again unable to account for the disposition of this stock, except to say that either the stock or proceeds of the sale of the stock were "distributed." Transcript at 86.

        b.    *Real Estate*

Street's management of the real estate transferred to the Trust can, at best, be depicted as inattentive. For example, the Disclosure Statement described certain real property located in North Carolina described as "eight home lots" having little value. Street never appears to have validated the potential valuation, as he never had an appraisal done or visited the property. Transcript at 105. The Successor Trustee is investigating whether any other efforts were taken to determine the value of this property. It appears as though the property was never marketed or listed for sale with a broker. Transcript at 106. As to the current disposition of this asset, Street thought it still was an asset of the Trust but was "not sure" if the real property taxes had ever been paid on the property. Transcript at 107.

As to three properties located in Jacksonville, Florida (Hogan Creek, Pickettsville Dump, and Mayport), the Disclosure Statement indicated that the values of these properties were "very difficult to determine." Street apparently made no attempt to have these properties appraised. Transcript at 108. Notwithstanding, Street reported that the Hogan's Creek property was sold for $175,000 without having been listed for sale, because "the property was being taken under eminent domain for . . . $35,000." Transcript at 108-109. The Trust's General Ledger shows only one sale of property, for $34,000. As to Pickettsville and Mayport (which was estimated in the Disclosure Statement to be worth at least $300,000), Street said he "may or may not have"

Double A 0664

paid the taxes on the properties. Transcript at 110. Street had no recollection at all on the disposition of a 7.89 acre property with a building located in Harrisburg, Pennsylvania, which the Disclosure Statement stated had been "appraised for $350,000." Transcript at 111-112.

In addition, the Trust held an interest in a property in Germany, which Street characterized as an "option."[21] Street said that "The Trust Advisory [Committee was] not in favor of . . . exercising the option." Transcript at 101. In spite of the fact that Street testified that the property was valued at approximately $20 million U.S., and Street apparently made a trip to Germany to assess the property, Street apparently did not inform or make any recommendation to the Trust Advisory Committee in writing concerning this property and simply let the option expire. Transcript at 102-104.

      c.   *Claims & Escrows of the Estate*

Street testified that, as Trustee, he was directly responsible for the management of claims and lawsuits of the estate. Transcript at 130. When Street was queried concerning the claims of the estate and related escrowed funds that were transferred to the Trust, however, Street simply stated that his "spreadsheet" did not include the miscellaneous escrows and receivables owed to the Trust, if they were "contingent." Transcript at 118, 122. Nor did Street's "spreadsheet" appear to list any litigation claims owned by the estate. As a result, Street seems to have ignored these assets and possibly may have squandered their potential to deliver significant value to the Trust.

For example, the Disclosure Statement discussed funds concerning workers' compensation claims escrowed by AIG, as well as substantial related claims held by the estate

---

[21] The books and records of the Trust also speak of a neighboring property owned by Ackermann-Fruehauf Corp GmbH worth DM 6 million, which may have also been an asset of the Debtors' estate. The successor Trustee is investigating this matter.

SDODMS1/658606.13

Double A 0665

against AIG. Street contended that the AIG escrow, which he estimated was approximately $2.8 million, had workers' compensation "claims [that] far exceeded the escrow." Transcript at 126. Street admitted, however, that he did not know if these were prepetition claims. *Id*.

As for the litigation against AIG, Street claimed that the claim was subject to arbitration and that former counsel to the Trust had advised him not to pursue arbitration on the AIG claim. 451. The former counsel disputes Street's contention. In any event, this litigation, valued at $4.5 million in the Debtors' Disclosure Statement, was not pursued by the Trust. The Successor Trustee is currently assessing whether this claim is still viable or whether it may have been waived or otherwise forfeited due to Street's failure to pursue the claim.

In addition, when presented with a list of five pending adversary proceedings initiated by the Debtors in the Bankruptcy Court, Street appeared to have no recollection. Furthermore, Street had no explanation as to why all efforts to pursue these claims appeared to cease on or about June 2000. In spite of the fact that Street claimed to be "responsible for litigation" on behalf of the Trust, Transcript at 155, he testified that he kept no files on the pending litigation and could not identify or discuss a list of adversary actions that had been pending as of the date of his departure as trustee. Transcript at 159-60. The Successor Trustee is presently assessing the status of these claims and determining whether they are still viable for aggressive litigation or whether these claims have been waived due to neglect.

        d.    *Jacksonville Note*

The Jacksonville Riverfront Development Note (the "Jacksonville Note") was a secured mortgage note on a property in Jacksonville, Florida. As discussed below, at Street's prompting, the performing Note was purchased by the Pension Plan on December 31, 1999. Street indicated that his decision to sell the Note to the Pension Plan was because "the financial position of the . .

-23-

Double A 0666

. End of the Road Trust improved." Transcript at 96. Street testified that the Pension Plan paid "par . . . and eventually received the accrual of another half percent." Transcript at 92. The proceeds of only a portion of the sale price of the Note were distributed, the rest appears to have been used for overhead expenses of the Trust.

        e.     *Fruehauf de Mexico*

     FdM is a Mexican trailer manufacturer which was described in the Disclosure Statement as a significant asset of the Debtors' estate, having produced a monthly operating profit since June 1997. The consistent operating profits of FdM appear to have served as a source of cash for Trust overhead expense as well as a means for Street to finance several failed acquisitions by the Trust and/or the Pension Plan. These acquisitions, of American Trailer and of Dorsey, collectively raided approximately $6.6 million of working capital from FdM over the course of five years. On one hand, FdM infused approximately $3.8 million into American Trailer, which was owned by FdM's parent, the Trust. On the other hand, FdM infused approximately $2.8 million into Dorsey, *which was owned by the Pension Plan*, and thus did not benefit either FdM or its owners. In addition, FdM appears to have paid hundreds of thousands of dollars of overhead and miscellaneous expenses of American Trailer, as well as of Dorsey, although Dorsey had no ownership relationship to FdM.

     When queried concerning the capital outlays from FdM, Street was distinctly uncooperative. For example, Street first refused to answer any questions when shown financial statements that the Successor Trustee had obtained from FdM's controller, stating that he "could not speak to the factual nature" of these documents. *See* Transcript 203-29. Although Street should have been familiar with the form and content of these documents in his claimed oversight

-24-

Double A 0667

role of the FdM asset, Street was generally unresponsive to queries whether these documents demonstrated that FdM was owed $971,000 by American Trailer as of December 31, 2001.

When presented instead with the audited financial statements and statutory auditor's report prepared by PricewaterhouseCoopers, Street was equally unhelpful. Street refused to answer questions about approximately $1.37 million[22] was shown as owed FdM by American Trailer as of December 31, 2000. Likewise, when shown an approximately $2.96 million[23] receivable reflected as due from the U.S. Holding Co. as of December 31, 2001 in the notes to these same audited financials, Street refused to provide any comment on the probable disposition, because he would "rather look at the work papers for Pricewaterhouse for how that receivable was resolved." Transcript at 266. Then, when presented with the approximate $2.8 million[24] owed FdM by the U.S. Holding Co. as of December 31, 2001, Street refused to acknowledge that such amounts were owed, stating that these audited financials showing accounts receivable from holding and affiliated companies were "incomplete." Transcript at 234.[25]

To queries why the notes to the audited financial statements and statutory auditor's report prepared by PricewaterhouseCoopers in 2002 showed that a $3.725 million [26] capital reduction was taken in the FdM capital stock, Street responded only that it reflected a "more true financial position of the company." Transcript at 261. When pressed for a further explanation, Street said

---

[22] 13.2 million pesos at an exchange rate of 9.62 ps/$1.00.

[23] 27 million pesos at an exchange rate of 9.15 ps/$1.00.

[24] 25.6 million pesos at an exchange rate of 9.15 ps/$1.00.

[25] The 2000/2001 audited report showed a 13.2 million peso receivable owed by the U.S. Op. Co. in 2000 and a 25.6 million peso receivable owed by the U.S. Holding Co. to FdM in 2001. The financial statement for 2001/2002 showed a 27 million peso receivable owed by the U.S. Holding Co. in 2001 and a $13.8 million peso receivable owed by Dorsey in 2002.

[26] 38.6 million pesos at an exchange rate of 10.36 ps/$1.00.

Double A 0668

he could not say why without seeing the Pricewaterhouse work papers.[27] Transcript at 262. The Successor Trustee notes, however, that the amounts owed to American Trailer and to the U.S. Holding Co. appear to have substantially disappeared from the balance sheet at or about this same time.

Street was singularly uncooperative when queried about the potential disposition of amounts owed to FdM under the various related party transactions Street had orchestrated. For example, although Street claimed to regularly sign off on the FdM audited financial statements, he refused to indicate whether a reserve or write-off was ever taken as a result of these related party receivables, refusing to comment even on whether an "allowance for doubtful accounts" listed in the FdM audited financials was the equivalent of a reserve. Transcript at 281, 303-304. Likewise, after being shown a claim for $2 million that was filed by FdM in the Dorsey bankruptcy, Street refused to acknowledge that FdM was "owed" money by Dorsey, choosing to refer to these items instead as simply "transactions." Transcript at 369.

Aside from providing the seed capital to launch Street's failed acquisition schemes, FdM was otherwise used by Street to provide a steady source of cash to finance Street's travel-related expenses for the other entities, including Dorsey.

Notwithstanding Street's utilization of FdM as an acquisition piggy bank, Street's management of FdM may best be described as indifferent. For example, although Street testified that he "devoted time to Fruehauf de Mexico consistent with managing the assets of" American Trailer Industries, Inc., he could not give any estimate of the actual time he devoted to the Mexican Company. Transcript at 62-63. Likewise, Street indicated he was responsible for payment decisions at FdM, but "was not exactly sure" of the payment levels that required his

---

[27] PricewaterhouseCoopers, LLP was the auditor for FdM during the relevant timeframe.

-26-

Double A 0669

authority. Transcript at 66. Nor was Street sure who had authority to authorize capital expenditures at FdM, although he claimed that he was responsible for reviewing the finances of FdM, review and approval of budgets, and "payment decisions." Transcript at 64-67.

Perhaps filling the role of corporate stepchild, FdM appeared to be the unwilling recipient of used, unwanted, and unusable equipment from the other entities. For example, in 2001 FdM was charged $221,480 for a "burn table," which FdM has never been able to utilize. Transcript at 193-195. The Successor Trustee is informed and believes that this equipment had been leased to American Trailer. In spite of the fact that American Trailer does not appear to have had the title to the equipment, and contrary to the lease agreement specifically prohibits any assignment or transfer, this equipment was sold to FdM. Furthermore, the Successor Trustee is informed and believes that the equipment blew up when being disassembled for shipment to Mexico, being thereafter inoperable. Street nonetheless shipped the equipment to FdM and proceeded to invoice FdM for $221,480.

All in all, it is a wonder that FdM survived. In any event, after over eight years, the FdM asset has not been liquidated by Street, and it remains a current asset of the U.S. Holding Company. Any sale of FdM is currently hampered by the legacy of Street's mismanagement. This legacy has left FdM with unresolved tax issues and legal uncertainties, including a pending Department of Labor investigation expressly targeting FdM.[28]

### 2.    Liabilities

As to the universe of potential liabilities of the Trust, Street appears to have been largely oblivious. For example, Street testified he had no knowledge if there were any contingent claims

---

[28] The Successor Trustee met with representatives from the DOL in mid-February 2006 concerning many of the issues otherwise discussed in this Report. Entanglements between FdM and the Dorsey entity appear to be an important focus of their inquiry.

Double A 0670

against the estate. Transcript at 127. When presented with a specific claim that had been discussed in great detail in the Disclosure Statement, a claim for $300,000 by the Ohio Department of Workers' Compensation, Street claimed that he was "advised by counsel that failure to act by Ohio had expunged . . . this claim . . . that we didn't have to pay it." Transcript at 170-171. The former counsel to the Trust contends that he did not offer such advice to Street. Street also testified that "I can't tell you whether we reserved or didn't reserve for this claim." Transcript at 172. The Successor Trustee is informed and believes, however, that this claim was originally reserved for by the Trust, but the reserve was abandoned at a point in time when the Trust came under some financial pressure.

As such, Street appears to have put no logical method in place for either assessing or tracking claims in general and/or the appropriate reserves to be made for such claims. When queried on the issue of reserves made to provide for such claims, Street testified that he was "responsible" for managing the reserve account for disputed claims, which was held under a Wells Fargo Trust account. Transcript at 128. Street also testified that at the time of the last distribution to unit holders, the reserve account was approximately $100,000. Transcript at 166. Furthermore, shortly before his departure, Street had instructed Wells Fargo to "close the reserve account because all disputed claims can be expunged and we no longer need to keep track of them." Transcript at 167-68.

The Successor Trustee has concerns that the Trust may be subject to contingent liabilities from claims, both known and unknown. Alternatively, no reserves appear to be currently in place to provide for known contingent liabilities, much less those that are unknown and/or unexplored.

-28-

Double A 0671

IV.

## SIGNIFICANT TRANSACTIONS UNDERTAKEN BY STREET ON BEHALF OF THE TRUST AND ITS RELATED ENTITIES: A RECURRING PATTERN OF CONFLICTS OF INTEREST

### A.    Sale of Jacksonville Note by the Trust to the Pension Plan

As mentioned above, the Jacksonville Note was a secured mortgage note on a property in Jacksonville, Florida, which was held by the Trust. At Street's suggestion, the Note was purchased by the Pension Plan on December 31, 1999. Although the minutes of the PTC for this period of time are missing, it appears that Street may have represented parties on both sides of this transaction.

Street was an officer of and represented the seller of the Note, the Jacksonville Shipyards, LLC, which was a wholly-owned subsidiary of the Trust. Transcript at 89-91. As stated above, Street was an officer and director of the PTC, the sponsor of the Pension Plan that purchased the Note. Although Street testified that Street Asset Management was not serving as an advisor to the Pension Plan at the time of the Jacksonville Note transaction and that neither Street nor his entities received a fee in connection with that transaction, Transcript at 98-100, this appears to be accurate but incomplete. The Successor Trustee is informed and believes that Street Asset Management LLC received ongoing management fees of 1% annually for its "management" of the Note.

Aside from the above, there were other issues with the propriety of the transaction. Although under the Trust Agreement the sale or transfer of the Note would have required the prior approval of the Trust Advisory Committee, Street has testified that he "was not familiar if" the transaction was approved by the Committee. Transcript at 93. The Successor Trustee has found no evidence that the transaction was approved by the Committee.

-29-

Double A 0672

Furthermore, it is difficult to assess if the transaction was at arms' length. A fair value assessment of the transaction is difficult to arrive at because Street did not appear to obtain an appraisal or valuation on the Note and merely "relied on the appraisal of the property and information from professionals." Transcript at 92. Moreover, the Note does not appear to have been actively marketed, as Street testified that he only sporadically worked with a "law firm on trying to market the note." Transcript at 94. Furthermore, Street's rationale for the Trust's sale of the Note is unconvincing. Although Street testified that his decision to sell the Note to the Pension Plan in December 1999 was because "the financial position of the . . . End of the Road Trust improved," Transcript at 96, the Successor Trustee can see no proof in the Trust's General Ledger that this was in fact the case.

In 2000, the DOL initiated an investigation of the Trust related to the transaction involving the Jacksonville Note, based on, *inter alia*, its concerns that the transaction may have been a prohibited transaction under ERISA. The Successor Trustee is informed and believes that this investigation is still pending. *See infra* Section II.A.3.b.

## B.  Purchase of American Trailer Inc.

In September of 1999, Street began to orchestrate the purchase by the Trust of the assets of a bankrupt trailer manufacturer, American Trailer Manufacturing, in a Bankruptcy Code§ 363 sale. Street claimed that the acquisition would create "synergies" with FdM, including for purposes of obtaining a United States trademark and to provide a distribution channel for FdM in the United States. Transcript at 179. According to Street, "the acquisition was very successful in that it allowed Fruehauf de Mexico to dramatically change its design structures and to gain the . . . use of the trade name for distribution" along with the customer lists. Transcript at 182.

-30-

Double A 0673

The reality was different. Under the Asset Purchase Agreement, the newco, ATM Acquisition Corp., purchased the assets of the bankrupt American Trailer Manufacturing for $235,000, assumed a Credit Agreement in the amount of $826,519.28 (secured in part by 4,808,631 shares of FdM stock), and entered into a new capital lease for equipment with a face value of $762,283.90.[29] American Trailer never had positive cash flow, and its brief operations had to be continually supported by constant cash inflows from FdM. Transcript at 181. Ultimately, the venture appears to have burned though at least $3.8 million provided by FdM within its approximate one year and four months of active operation.

On questioning, Street attempted to obfuscate the facts concerning the failed venture, suggesting that American Trailer "still does distribute trailers in the United States that are exported by Fruehauf de Mexico." Transcript at 183. When shown a certificate of dissolution of American Trailer, Street gave the alternative suggestion that they had "consolidated the corporation at the time [under the U.S. Holding Co.]" Transcript 183. Furthermore, Street's assertions of benefits to FdM from this transaction appear to belie the facts. When shown FdM accounting records showing the approximately $3.8 million of funds drawn out of FdM to support American Trailer, Street became unresponsive and otherwise refused to answer the questions posed. *See* Transcript at 203-217. Street refused to acknowledge that the receivables from American Trailer were written off, claiming that they were "reserved" even though he admitted that they amounted to "hundreds of thousands of dollars" and that American Trailer was dissolved and no longer in business. Transcript at 241.

In the end, the decline and death of American Trailer was unusually swift. The American Trailer transaction closed on November 8, 1999, the entity terminated all its employees in

---

[29] The approval for the transaction obtained by Street from the Trust Advisory Committee specified different terms: payment of $225,000, assumption of secured debt of $721,000, and assumption of $500,000 of capital leases.

Double A 0674

December 2000, disposed of its assets shortly thereafter, and was officially dissolved in 2003.
Transcript at 185.

## C.    Purchase of Dorsey by the Pension Plan

Undeterred by the failure of American Trailer, which had ceased operations in
approximately the first quarter of 2001, Street almost immediately ventured into another similar
acquisition, this time of the bankrupt trailer manufacturer, Dorsey. In May, 2001, again
proclaiming the potential "synergies" with FdM. Street extolled the virtues of the transaction
because FdM "didn't own a trade name in the United States or have substantial distribution in the
United States and that the synergy may be interesting to explore." Transcript at 329. Street
apparently also thought that Dorsey, being substantially similar to FdM in its business operations
and profile and with similar purchasing needs, could buy product cheaper than FdM. Transcript
at 332.

Street, however did not present this "opportunity" to the ultimate parent of FdM, the
Trust, and he did not request approval by the Trust Advisory Committee. Rather, beginning in
approximately May 2001, Street became the proponent for and eventually orchestrated the
acquisition of the Dorsey entity by the Pension Plan, which had no ownership relationship to
FdM. Undaunted by the Department of Labor concerns over the propriety of the recent
Jacksonville Note transaction, Street actively encouraged the purchase of Dorsey by the Pension
Plan, even going so far as to make a presentation to the PAC advocating the purchase by the
Pension Plan. Having obtained PAC authorization of a deposit of $200,000 and a maximum
investment of $5.7 million,[30] Street attended the bankruptcy auction and apparently made the bid

---

[30] The Successor Trustee discloses that from May 24, 2001 to July 6, 2001 (approximately 6 weeks), which was
during the time the Dorsey acquisition was considered, he served briefly as a member of the PAC. During this time,

-32-

Double A 0675

for the asset with Don Sheetz, the representative of the PAC. Transcript at 669-70. According to Street, the winning bid was funded by "approximately $6 million and . . . after certain offsets and reductions, the net value was approximately $4 million" with the remainder for working capital. Transcript at 350.

Street testified that "he never had a concern" that there might be a potential conflict of interest in connection with the Dorsey transaction. Transcript at 681. Street presided over numerous transactions between and among the Pension Plan's wholly owned asset, Dorsey, and the entities owned by the Trust, including:

- "[H]undreds of thousands of dollars" of assets of the defunct American Trailer that were shipped to Dorsey, ostensibly for later transfer to FdM. Transcript at 371.[31]

- Street testified that Dorsey "may have" paid the payables of American Trailer. Transcript at 374.

- The Trust "may or may not have" paid for the legal or professional consulting services attributable to Dorsey. Transcript at 376-77.

- There were services agreements put in place between Dorsey and FdM, whereby Dorsey agreed to distribute FdM product in the United States. Transcript at 338.

- Service agreements were entered into under which the U.S. Holding Company was to receive a fee of 1 ½ percent of Dorsey's gross revenues for "management

---

he voted to approve the purchase of Dorsey. The other members of the PAC at this time were Donald Sheetz and Worth Frederick.

During approximately this same period of time, Street and the Successor Trustee discussed possible joint marketing opportunities through the use of the name, "Harrow Street Associates." A marketing brochure for Harrow Street Associates was created, but nothing came of these efforts.

[31] The Successor Trustee is informed and believes that this equipment was likely obtained on a capital lease entered into by American Trailer. As such, American Trailer may not have had title to transfer to Dorsey. Nor is it clear which entity made the lease payments, which are likely to have been ongoing.

SDODMS1/658606.13

Double A 0676

services." Transcript at 346. Senior management personnel was provided to Dorsey by the U.S. Holding Company. Transcript at 340-41.

- Although Street testified that he was not compensated for his services by Dorsey, either directly or indirectly, he agreed that his travel and other expenses were paid by Dorsey. Transcript at 357.

- Although Street testified that he was not compensated for his services by Dorsey, on June 23, 2001, the day after a Services Agreement was entered into by Dorsey and the U.S. Holding Company, Street unilaterally increased the compensation he received from the Trust and/or its associated entities by $50,000 per year (the same base compensation he was receiving for overseeing the FdM entity) to a rate of $300,000 per year.

In the end, Dorsey filed for bankruptcy—again—in October 2004. Before its bankruptcy filing, Dorsey, like American Trailer before it, utilized FdM to fund operations. The audited financials of FdM showed approximately $2.75 million[32] owed to it by Dorsey as of December 31, 2004. A claim for $2 million was filed by FdM in the Dorsey bankruptcy and the U.S. Holding Co. filed another claim for $500,000, probably an upstream treatment of the liability of Dorsey to FdM.[33]

The Dorsey debacle ended up costing the Pension Plan well in excess of its original $5.7 million investment. In addition, at a minimum, it cost the Trust and its related entities the approximately $2.8 million in capital infusions by FdM, plus additional amounts transferred in the form of miscellaneous expenses charged to FdM, insurance payments made by FdM, and the

---

[32] 31.2 million pesos at an exchange rate of 11.3775 ps/$1.00.

[33] The Successor Trustee is unable to explain the approximate ($250,000) differential in amounts owed by Dorsey.

Double A 0677

like. The Successor Trustee is continuing to reconstruct the accounting related to the Dorsey

entity.

V.

## TRUST ADMINISTRATION AND CORPORATE GOVERNANCE: THE PATTERN OF MISMANAGEMENT AND SELF DEALING REPEATS

Under Delaware trust law, a trustee is required to "act with the care, skill, prudence and

diligence under the circumstances then prevailing that a prudent person acting in a like capacity

and familiar with such matters would use to attain the purposes of the account." 12 Del. Code

§ 3302 (2005). Furthermore, under Delaware corporate law, an officer or director has a duty of

care and a duty of loyalty to the company. An officer or director cannot be exculpated: (i) for

any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or

omissions not in good faith or which involve intentional misconduct or a knowing violation of

law; (iii) for unlawful distributions; or (iv) for any transaction from which the director derived an

improper personal benefit. 8 Del. Code § 102.

In light of the foregoing standards, the following is a status report of the Successor

Trustee's findings to date on Street's general administrative oversight over the Trust's affairs.

### A. Corporate Governance of the Trust and Entities Related to the Trust

The corporate governance for the Trust and the seven entities directly or indirectly owned

by the Trust appears to have potentially exposed the Trust, its beneficiaries, and the entities

directly or indirectly owned by the Trust to liability. For example:

#### 1. U.S. Holding Company

Street testified that he "had a recollection" that Victoria Street (his wife) "maintained the

minutes" of American Trailer Industries, Inc. and that the prior office manager, Courtney

Watson, maintained the minute books before that time. Transcript at 394-95. In fact, this

Double A 0678

maintenance appears to have not been done. The official minute book of American Trailer Industries, Inc. contains no records whatsoever of any annual shareholder meetings or meetings of the board of directors. There are no minutes at all contained in the minute book. The most recent entry in the minute book is a Written Consent dated December 1, 2000.

### 2.    Pension Transfer Corp.

The minute book for PTC contains no entries prior to May 24, 2001. The minute book contains no minutes, no bylaws, and no evidence of any annual shareholder meetings or meetings of the board of directors. According to the records from the State of Delaware, the Pension Transfer Corporation's corporate charter became "void as of 03-01-2000" for failure to pay franchise taxes. Street attempted to explain this anomaly by suggesting that the Pension Transfer Corporation had merged or changed its corporate status to an LLC. The Successor Trustee has run a search of online databases, and no records exist reflecting the existence of any such successor in interest.

### 3.    American Trailer Inc.

There are no records of any annual shareholder meetings or meetings of the board of directors of American Trailer, Inc. There are no minutes contained in the minute book. The corporation's status under the state of Delaware was "revoked" on July 24, 2003.[34] The last entry in the minute book is a Certificate of Dissolution dated September 10, 2003. There is no resolution concerning the disposition of substantially all of the assets upon dissolution of the entity.

---

[34] Mr. Street thought that the company's accountants were responsible for ensuring the franchise tax payments on behalf of the corporate entities, perhaps explaining the multiple instances of non-payment of these fees that the Successor Trustee has discovered. Transcript at 395-96.

SDODMS1/658606.13

Double A 0679

### 4. Other Special Purpose Entities

No minute books appear to have been kept for JSI Property Holdings, LLC, the other special purpose entity held by the Trust, which held the other subsidiary entities: Harrisburg Realty Inc., JSI Lexington Realty Inc., Picketsville Realty Inc., Mayport Realty Inc., Hogan's Creek Realty Inc., and Sindorf Holdings, LLC. The corporate status of JSI Property Holdings, LLC was cancelled by the State of Delaware on May 16, 2001. The Successor Trustee is researching the status of the subsidiary entities. As mentioned above, the real property taxes for the real property assets held by these entities appear to have not been paid.

### 5. The End of the Road Trust

The Trust appears to have filed a Statement and Designation by Foreign Association and Officer's Certificate with the State of California averring that the Trust was a "business trust organized and existing under the laws of Delaware." The Trust filed another Statement and Designation by Foreign Association and Officer's Certificate signed by Chriss Street that the End of the Road Trust was "a business trust organized and existing under the laws of Texas." Upon information and belief, the Trust is a Delaware common law trust.

The Trust Agreement expressly requires pre-approval from the Trust Advisory Committee for certain transactions by the Trustee. Street failed to obtain this approval on many occasions when it was required. For example, no written approval was obtained for the sale of the Jacksonville Note or for the Kearney Note. Likewise, although approval was obtained for the American Trailer acquisition, the actual terms of the acquisition differed from what had been represented to, and approved by, the Trust Advisory Committee.

The Trustee is required to prepare, deliver, and file quarterly reports with the Trust Advisory Committee. Street could not aver that this duty was performed when queried about this

-37-

Double A 0680

requirement. *See* Transcript at 402-03. Indeed, Street appears to have generally kept the Trust

Advisory Committee in the dark. Nor were the reports and filings required to be made by law to

the United States Trustee submitted. United States Trustee was required to bring a motion to

compel compliance by Street in this respect.

The End of the Road Trust Reference Manual contains a section entitled "Employee

Handbook." This section of the Manual is empty.

## B.    Tax Returns, Audits, and Accounting

The finance and accounting of the Trust and the entities related to the Trust appear to

have been mismanaged.

### 1.    Tax Filings

#### a.    *Failure to File*

The Successor Trustee has discovered from the Internal Revenue Service that the

Debtors' federal tax returns were never filed for the tax years 1997 and 1998.[35] Street's failure

to file the Debtor's federal tax returns for 1997 and 1998 appears to have been an extraordinary

dereliction of his fiduciary duty, not only because he failed to execute on the Plan, which

expressly provided for favorable tax treatment for the FdM entity, but because he either knew or

should have known of both the need and his duty to file these tax returns.

In brief, the Plan was amended by virtue of a Court Order dated October 20, 1998, to

provide for the creation of a special-purpose entity, FrudeMex, Inc. (referred to herein as the

U.S. Holding Company), which would exist to hold the shares of FdM, previously held by

---

[35] The Securities & Exchange EDGAR web site reflects the fact that Mr. Wong, in his capacity as Chief Financial Officer of the Debtors, attested for the Debtors to the fact that the Debtor was current on all postpetition federal taxes.

Double A 0681

Fruehauf Trailer Corporation and Fruehauf International, Ltd. The Plan was also amended to

provide that:

> On or prior to the Effective Date, each Debtor which owns stock in
> Fruehauf de Mexico shall receive a pro rata share of the stock in
> FrudeMex, in exchange for consideration of each Debtors's stock
> in Fruehauf de Mexico.

On or about this same time, Street received a letter from counsel, instructing him on the

exact steps that he needed to take on behalf of the Trust in order to effectuate this provision in

the Plan, which, as this letter explained, was put in place to enable the Trust to eliminate the

payment of Mexican capital gains taxes on the transfer of the shares of FdM to the Trust,

pursuant to the requirements of a tax treaty in place between the United States and Mexico.

Furthermore, as the letter explained, adherence to the Plan would enable the Trust to liquidate

the asset in the future with a carryover tax basis, thereby enhancing the value to the Trust and

encouraging an efficient liquidation of the FdM stock. This letter from counsel gave the

following instructions:

> We are currently undertaking to implement this two-step transfer
> structure. Please note, however, that a condition to the tax
> exemption is that [Fruehauf Trailer Corporation, Fruehauf
> International Ltd. and the U.S. Holding Co.] **MUST** file a
> consolidated tax return for the period prior to the effective date
> (emphasis in original).

No consolidated tax return was filed by Street on behalf of the Debtors. The Debtors did not file

a 1998 tax return at all.

When queried about this oversight, Street appeared nonchalant, indicating that he "was

advised by Pricewaterhouse and [he] took their advice. Transcript at 423. The Successor

Trustee is, however, informed and believes that Pricewaterhouse ceased to provide tax

Double A 0682

accounting services to the Debtors in or around 1994. When queried further, it became obvious that Street had taken no steps to ensure that the Plan was properly effectuated in this respect.

The Successor Trustee is informed and believes that Street filed the Debtors' delinquent tax returns for 1994 though 1996 on or about 1998, only after numerous notices of default from the Internal Revenue Service had been received by the Trust. Yet Street still failed to file the tax returns for 1997 and 1998, although he knew (or should have known) that they were also delinquent at this time. The Securities & Exchange website explains that Street, as the Chairman and CEO of the Debtors, had the means to file the returns and the duty to do so: "On June 1, 1997 the remaining assets and financial documents [of the Debtors] were transferred from Indianapolis, Indiana to the current FTC headquarters located in Corona del Mar, California. Henceforth, the Debtor began "fresh start" accounting procedures and financial statements." See U.S. Securities & Exchange Commission, Fruehauf Trailer Corp., *at* http://www.sec.gov/Archives/edgar/data/874268/0000874268-98-000013.txt

Furthermore, Street's failure to comply with U.S. law with respect to the Debtors' required federal income tax filings is likely to have otherwise imposed a corollary liability upon FdM under the laws of Mexico. The Successor Trustee is currently investigating alternative ways to comply with IRS requirements and is investigating any associated liability arising under Mexican law. Compliance with IRS requirements is likely to be expensive; relief is not certain nor can it be obtained quickly.

      b.    *Irregularities in Filed Tax Returns*

The Successor Trustee is reviewing the state and federal tax returns for the Trust and its directly owned entities and has noted several areas of concern. For example, the Successor Trustee notes that a "correction" to Street's W-2 income for 2003 was reported by the U.S.

-40-

Double A 0683

Holding Company to the IRS under a Form 941c dated November 10, 2004, reducing Street's gross income from $278,846.34 to $174,020.16, a reduction of $104,826.18. Although this adjustment was reflected on the U.S. Holding Co.'s federal tax return, the Successor Trustee's review of the payroll records shows that Street received the $278,846.34 in gross income originally reported to the IRS, not the lesser, "corrected," amount.

The Successor Trustee is also informed and believes that exactly $104,826.18 was lent by Street to the Dorsey entity. The Successor Trustee is at a loss to understand why an offset, assuming it is even proper in the first place, should have been taken be against Street's salary from the U.S. Holding Company vis-à-vis an uncollectible loan he personally made to Dorsey.

The Successor Trustee is very concerned that similar irregularities may exist in the tax filings for the Trust entities and may require the services of a forensic accounting specialist. It appears that the Trust entities' tax returns were prepared by two different certified public accounting firms. The Successor Trustee will report to the Court on any additional issues that are revealed by virtue of the abovementioned more thorough review and analysis of these returns.

### 2.    Audits & Accounting

The Successor Trustee is collecting the various financial statements, balance sheets, general ledger records, and audits of the Trust and the entities related to the Trust. Although the services of a forensic accounting firm may be necessary to untangle the web of related party transactions and under documented intercompany transfers, it appears upon an initial review as though questions might arise as to the propriety of some of the accounting for transactions among the entities related to the Trust. Furthermore, as noted *supra* at 19, audits of the Trust

SDODMS1/658606 13

Double A 0684

ceased in approximately 2001, further increasing the accounting ambiguities of these
transactions.

### 3.    Records Management

The Successor Trustee retained a well-respected third party forensic accounting firm to
take custody of the books and records of the Trust upon Street's departure on or about August 1,
2005. Upon an initial review of these books and records, the Successor Trustee is concerned that
there may be some serious deficiencies in Street's management and protection of the records of
the Trust as well as the Pension Plan. In short, important records appear to be missing.

Street testified that the document retention policy for the Trust and its related entities was
simply, "the Trust retained documents" Transcript at 416-17. This, however, appears not to
have been the case. For example, custody of the residual records of the Pension Plan had been
ceded to Street by Donald Sheetz on March 30, 2005. According to a letter contained in the PTC
minute books, these remaining records apparently consisted of actuarial valuations, participant
payment records, correspondence, etc., concerning the Pension Plan that had not been retrieved
by the PBGC upon the PBGC's takeover of the sponsorship of the Pension Plan. According to
the PTC minute books, the PBGC had informed Mr. Sheetz that they did not have the authority
to advise the PTC to destroy or otherwise dispose of these records. Street testified, however, that
he believed that certain files "under the control and authority of the Fruehauf Trailer Pension
Plan" were "thrown out" and the file cabinets donated to charities sometime after March 30,
2005. Transcript at 413-14. The contents of approximately 50-60 file cabinets appear to have
been disposed of around this same time. Transcript at 416.

In addition, Street testified that on or about the time of his departure from the
employment of the Trust, he "eliminated the information" from a certain Apple computer

-42-

Double A 0685

belonging to the Trust. Although Street testified that this information was "personal information" and that "there [were] no files that were the End of the Road Trust's files on that computer," the Successor Trustee has no way of validating Street's assertion. Street's assertion otherwise seems unlikely, in light of the fact that this Apple computer was Trust property, ostensibly provided to Street for purposes of Trust business.

As mentioned above, the Successor Trustee has been unable to locate portions of minute books—and some cases entire minute books—among the Trust's books and records. There appears to be no list of contingent claims, or status of any reserves taken on these claims. There appears to be no list of potential reimbursement claims to which the Trust may have a right. Transcript at 406-07.

## C.    Insurance coverage

The Successor Trustee is investigating the insurance coverages for the Trust and the entities related to the Trust. Unfortunately, Street terminated the Successor Trustee's Rule 2004 Examination of him prematurely, prior to the Successor Trustee being able to take any testimony by Street on this topic. The Successor Trustee's initial review of this subject matter raises great concern that Street may have exposed the Trust and its entities to serious risk by his management of the insurance policies and/or the failure to make payments on the policies in a timely and responsible manner.

Significantly, Street appears to have also converted the key fiduciary liability and director and officer liability policies for the Trust and its related entities to a "runoff" status shortly before his departure in July 2005. In doing this, Street assured that any liabilities for his prior acts would be covered by insurance but that any future acts (i.e., those of the Successor Trustee) would not be covered. Street took this action in spite of an express warning from the insurance

-43-

Double A 0686

broker that this conversion to a runoff policy would be inappropriate, as it would expose the Trust and its entities to serious and unnecessary risk. Only after a significant expenditure of time and effort was the Successor Trustee able to retroactively reverse the insurance coverage back to a standard policy.

In addition, it appears as though insurance payments for the benefit of the Dorsey entity were paid by the Trust. It appears that the insurance broker believed that the shares of the Dorsey entity were owned by the Trust, rather than by the Pension Plan. Street explained that there had been "a dispute about insurance payments with a broker in New York who issued policies without agreement of . . . End of the Road Trust and . . . used refunds to fund the down payment of those policies." Transcript at 409. The Successor Trustee continues to investigate this matter. The insurance company has retained counsel and has issued a claim to the Trust in the amount of approximately $15,000.

## D.    Payments and/or Gifts Made to Third Parties by the Trust and/or Its Related Entities

During his tenure as Trustee, Street used the Trust purse in ways that present the appearance that they may have exceeded the boundaries of reasonable discretion by a fiduciary. A few examples follow.

### 1.    James Wong/Stanford University

Mr. Wong was described by Street as an "at will employee" of the U.S. Holding Company. Mr. Wong, prior to his departure as an employee, had apparently expressed concerns about Street's management of FdM and monies being transferred out of FdM. Upon his departure Mr. Wong received payment by FdM of his tuition to Stanford University in the amount of approximately $56,100, which Street characterized as "in lieu of bonus and severance

Double A. 0687

and continuing compensation." Transcript at 451-461. Mr. Wong gave no continuing services to FdM, the Trust, or its related entities and did not return to work for any of these entities.

Street testified that there was not a bonus program in writing, but rather it was "discretionary." Transcript at 454-55. As such, it was decided on a case-by-case basis by Street. Transcript at 454-55. The Successor Trustee is investigating further the nature and business purpose, if any, of this particular payment.

### 2.    Books for Freedom

American Trailer donated $1,000 to Books for Freedom in early 2002, after American Trailer was, essentially, shut down. The Successor Trustee is informed and believes that Dorsey donated $10,000 to this organization. Books for Freedom appears to have been started by Street and his daughter. Although potentially a worthy cause, it raises questions of conflict of interest for Street to have made substantial donations by American Trailer and Dorsey to an entity that would potentially enhance Street's own reputation. Furthermore, the Successor Trustee can think of no valid business purpose for either American Trailer or Dorsey to have made such donations.

### 3.    Corona Del Mar Water Polo Tournament

In September 2000, the U.S. Holding Company donated $5000 to an entity known as the Newport Water Polo Foundation. This donation appears to have been for purposes of funding a men's water polo tournament. In addition to the donation, the Successor Trustee is informed and believes that Street required employees of the Trust and its related entities to work on sales and marketing efforts for the tournament while on Trust time.

The Successor Trustee is informed and believes that Street claims to have been the founder of the Newport Water Polo Foundation. The Successor Trustee is informed and believes

Double A 0688

that a former principal of the Pension Plan consultant, DAVRIC, Rich Pantuliano, encouraged Street's involvement in this tournament, due to the fact that Mr. Pantuliano's children participated on this team. Street's two sons apparently were also members of the water polo team that received the donation from the U.S. Holding Company. The business purpose of this donation is unclear.

## E.      Questionable Transactions Made by Street

### 1.      Office Space, Administrative Services

Street located the operations of the Trust in Corona del Mar, California. The offices, which overlook the yachts of Balboa Island (an exclusive Orange County, California coastal community), were an extravagant choice for the operations of a liquidating trust of a bankrupt estate. Furthermore, the space was ill suited to the Trust's needs. Although the lease was for more space than the Trust appears to have needed, the Trust apparently assumed this lease from Comprehensive Care, Chriss Street's former employer,[36] with approximately 4 years remaining on what had been a 5-year term. Street then arranged for the Trust to enter into several subleases with third parties for this unneeded space.[37] The Successor Trustee is also informed and believes that Street made the Trust enter into a lease for a corporate apartment on Balboa Island, which Street's parents occupied on occasions.

The offices in Corona del Mar also served as the headquarters of Chriss Street & Co., and later Street Asset Management, which used Trust office space, Trust phones, Trust office supplies, Trust computer systems, etc. Street Asset Management did not enter into a formal sublease with the Trust and/or otherwise pay rent to the Trust for the use of this office space and

---

[36] It appears that Street was still employed by Comprehensive Care at this time, and thus may have been on both sides of this lease transaction. The Trust's General Ledger also shows some significant recurring payments to Comprehensive Care that the Successor Trustee is investigating.

[37] For example, the Trust's General Ledger shows rental income for fiscal year 2004 totaling $64,831.72.

SDODMS1/658606.13

Double A 0689

accoutrements. Transcript at 380-86. Street claimed that Street Asset Management instead "paid certain expenses and . . . also paid half of the cost for the administrative person in the office . . . as compensation for use of the office." Transcript at 380-81. Street identified this administrative person as "Courtney Watson . . . and . . . after Courtney Watson left, Victoria Street. Transcript at 382. Street indicated that this arrangement was documented by an agreement that Street said he "probably wrote." Transcript at 384.

Street claimed that sharing of the salary of an administrative services fully reimbursed the Trust for Street Asset Management, LLC's use of the Trust's offices because the administrative person spent "less than 5 percent" of her time on Street Asset Management, LLC business. Transcript at 386. The Successor Trustee is, however, informed and believes that Ms. Courtney Watson spent approximately 85 percent of her time on Street Asset Management, LLC business. In any event, the Successor Trustee questions the propriety of such an arrangement between Street Asset Management and the Trust.

### 2.    Compensation of Consultants

During his tenure, Street retained numerous consultants for the Pension Plan, the Trust, and the entities related to the Trust. Many of these consultants appear to have been otherwise associated with Street and/or the entities owned by Street.

#### a.    *DAVRIC Human Resources Consulting, Inc.*

Street retained this entity to perform consulting work for the Pension Plan. The Successor Trustee is informed and believes that the Pension Plan paid DAVRIC a minimum of $120,000 per month for its services from approximately 1998-2001. The Successor Trustee is also informed and believes that DAVRIC was owned by Rich Pantuliano and David Vienneau, acquaintances of Street's. Mr. Vienneau died in 2002, and the entity appears to have been

-47-

Double A 0690

involuntarily liquidated under the laws of New Hampshire in 2004. The Successor Trustee is investigating the nature of the services provided.

b.    *The Resource Partnership*

The Resource Partnership n/k/a The Human Resource Partnership, LLC, appears to have received some significant consulting fees from the Pension Plan and/or the Trust. One of the key principals of The Resource Partnership was David Vienneau, also a principal of DAVRIC. Consultants of and/or individuals recommended by the Resource Partnership appear to have comprised the initial PAC, which selected Chriss Street & Co. as the investment manager for a substantial portion of the Pension Plan assets. This firm lists among its clients, Comprehensive Care Corporation, Chriss Street & Company, Pension Transfer Corporation, American Trailer, the End of the Road Trust, and Fruehauf Trailer Corporation. *See* The Human Resource Partnership, LLC, "Our Clients" *at* http://www.trp.com/OurClients.html (last visited March 2, 2006).

c.    *Hampton Human Resources Consultants*

Hampton Human Resources Consultants provided consulting services to the Pension Plan. The Successor Trustee is informed and believes that Hampton is a related entity to both DAVRIC and The Human Resource Partnership, LLC. The Successor Trustee is investigating the nature of the services provided.

d.    *Darin Simonian*

Mr. Simonian was an investment advisor to the Pension Plan. He appears to have prepared a monthly report on the investments, charts, etc. The Successor Trustee is informed and believes that Street had approached Mr. Simonian about joining Street Asset Management

Double A 0691

and that Mr. Simonian's father has made a contribution to Street's political campaign for Orange County Treasurer.

      e.    *Rhonda Lynn*

Ms. Lynn was hired as a consultant to both the U.S. Holding Company and, later, to Dorsey. The Successor Trustee is informed and believes that the services provided to the U.S. Holding Company by Ms. Lynn related to a conducting a market survey of the Alabama market and making "introductions" to appropriate contacts in the Alabama marketplace, *i.e.*, services likely related to the Dorsey acquisition. The Successor Trustee is investigating these fees, including why the services were paid for by the U.S. Holding Company.

**3.**    **Compensation of Chriss Street by the Trust and its Related Entities**

      a.    *Compensation Received from the Trust & the U.S. Holding Company*

As mentioned *supra*, Street received a base salary of $200,000 per year for his part time services as Trustee of the Trust. In addition, Street collected $50,000 per year in base salary for his duties as "Chairman of the Board and Chief Executive Officer" of the U.S. Holding Company, i.e., oversight of its wholly-owned subsidiary, FdM. Street was never a senior executive of the U.S. Holding Company. He only served on the board. The records of the company also show that he only intermittently served as Director General of its wholly owned subsidiary, FdM. Nonetheless, for his "management" of FdM, every year Street collected the base salary of $50,000 per year.

In addition, Street claimed that, under this employment agreement, he was entitled to receive "all of the fringe benefits and perquisites that are provided to senior executives of the Company or Fruehauf de Mexico, and . . . all employee benefit plans, programs and arrangements of the Company or Fruehauf de Mexico, now or hereinafter in effect." Transcript

Double A 0692

at 466. Street claimed that his entitlement to "perquisites" meant he would receive "stuff" or "goodies." Transcript at 489-90. Examples Street cited were autos, gas, insurance, club memberships, and vacations. Transcript at 489-90. As such, Street received reimbursement of a wide range of expenses, which were reimbursed directly off of his personal credit card by FdM. These particular perquisites—"goodies" for which he received expense reimbursement—were dispensed in multiples of Street's base salary amount under his employment contract with the U.S. Holding Company, far exceeding the typically modest parameters of a "perquisite" *i.e.*, a gratuity. *See infra* Section V.E.6.

Furthermore, Street was reimbursed for his "goodies" in a highly unusual manner. Instead of providing expense reports along with receipts and an explanation of the business purpose of the expense, Street instructed FdM to pay the balance of his personal credit card every month. Street provided online access to his Citibank credit card to FdM and instructed FdM personnel to pay the account monthly, which they did, without question, and without ever receiving the underlying receipts from Street.

Street described his expense reimbursement process in the following way: "I attempted to put my expenses on a dedicated credit card generally and that credit card would serve as a history of my expenses, and those expenses would be reimbursed off the credit card statement." Transcript at 524. FdM would pay the statements directly. Transcript at 525-26. Street said, "[i]t was considered part of their service payments to pay corporate overhead." Transcript at 526. As such, Street did not believe it necessary to provide receipts, trip reports, or any other documentation demonstrating the business purpose of these expenses he claimed were reimbursable. The only discussions Street could recall concerning the propriety of his

Double A 0693

reimbursements was that Mexican employees at FdM "apologiz[ed] for making payments late." Transcript at 620.

In addition to the "goodies" he received by virtue of the expense reimbursement process he put in place, Street also appears to have believed that his employment contract with the U.S. Holding Company also entitled him to unilaterally determine a bonus he would receive on an annual basis. Transcript at 468. Street testified that he first determined the content of the contract of FdM with its administrative employees. He then "calculated" the in kind amount he should be paid over his $50,000 base salary. Transcript at 469, 475. Street indicated that he never submitted the calculation to anyone for review or approval. Transcript at 482.

Even accepting Street's explanation as plausible, the aberrations in Street's earnings over the years are inexplicable. Under the FdM administrative contract, no employee's supplemental compensation can exceed 35% of base salary. As such, Street would have been limited to a maximum bonus amount of $17,500. But Street paid himself much more. For example, Street received salary of $136,800 for 62 days' service in 1998. Likewise, in 1999, Street earned total compensation of $288,461.[38]

The Successor Trustee is cognizant of the importance of the compensation issue and continues to review the record to assess this situation in depth. In particular, the Successor Trustee requires continued examination of Street concerning this matter.

### 4.    Compensation Received from Dorsey

Street testified that he did not receive "compensation" from Dorsey. Transcript at 347. That statement, however, appears to be incomplete. Street appears to have increased his

---

[38] Street also received amounts over and above his annual salary in calendar years 2001-2003, however, as discussed *infra* Section V.E.4, these increases in salary appear to have been related to Street's management of the Dorsey entity.

SDODMS1/658606.13

Double A 0694

$250,000 annual salary by $50,000 per year (*i.e.*, to $300,000 per year) on June 23, 2001, one day following the execution of a services agreement by the U.S. Holding Company with Dorsey for "management services." Absent a reasonable explanation from Street to the contrary, it appears that Street may have paid himself a salary for managing the Dorsey entity indirectly through the U.S. Holding Company.[39] Street himself testified that, under the services agreement, senior management personnel was provided to Dorsey by the U.S. Holding Company. Transcript at 340-41.

Furthermore, the Successor Trustee has reviewed Street's travel and expense reimbursement records and believes that a reasonable inference exists that Street routinely submitted his expenses for Dorsey travel and entertainment to FdM for reimbursement. This raises two issues. First, it appears that expenses of a subsidiary of the Pension Plan were being reimbursed by the wrong entity, an indirect subsidiary of the Trust. Second, because Street's credit card statement was automatically reimbursed and no receipts were submitted by Street for these reimbursements, it is unclear whether these were legitimate business expenses, or whether these were indirect payments in lieu of compensation to Street for Dorsey services, again, paid by FdM, rather than the Pension Plan. The Successor Trustee requires Street's continued examination of Street to determine these facts more thoroughly.

### 5.    Compensation of Vicky Street by the Trust and its Related Entities

The Successor Trustee is informed and believes that Victoria Cox Street, Street's wife, became an employee of the Trust and/or its related entities in approximately June 1, 2004. Ms. Street, unlike all other employees of the Trust and its related entities, was initially paid directly by the Trust and was not put on the official payroll administered by a national payroll service,

---

[39] In exactly the same amount as Street received for "managing" the FdM entity: $50,000 per year.

Double A 0695

ADP. Instead, Ms. Street received payments directly from the Trust checking account. These payments appear to have given no indication of the regular pay period rate, the period covered, the hours worked, etc. Furthermore, the amounts paid to Ms. Street during this time varied from week to week and came at irregular intervals. The Successor Trustee also notes that, during this time she was not on the official payroll, Ms. Street contributed an unusually large portion of her salary to the Trust's 401(k) plan.

On January 10, 2005, Ms. Street was put on the official payroll of the Trust, apparently at a bi-weekly salary of $1923.08. Ms. Street, however, inexplicably received $17,307.72 for the month of January, 2005. Ms. Street received two earnings statements for the pay period ending January 31, 2005, however, the hours worked on each of the statements was blank. The Successor Trustee intended to query Street about these payments to Ms. Street, but Street cut short his examination before the Successor Trustee had a chance to do so.

Commencing in February 2005, Ms. Street began to receive a salary of $50,000 per year from the Trust for what appears to have been a part time administrative position. At this same time, Ms. Street also worked for Street Asset Management, LLC, of which she was an officer and from which she also drew a salary. It is impossible to determine exactly how many hours out of a week were spent by Ms. Street on Trust business and how many hours were devoted to her duties at Street Asset Management, LLC, which at this time occupied the offices of the Trust. As stated above, the Successor Trustee is informed and believes that Ms. Street spent a maximum of 15 percent of here time (*i.e.*, six hours per week) on Trust business. Furthermore, even assuming that Ms. Street spent 50 percent of her time on Trust business, the equity of the arrangement is still highly questionable. Victoria Street was paid, on average, more than

-53-

Double A 0696

$50,000 per year for part time administrative services to the Trust, the full-time equivalent of more than $100,000 per year.

The Successor Trustee intends to examine Ms. Street concerning some of these issues.

### 6.    Expense Reimbursements of Chriss Street

The compensation of Street appears to include unfettered expense reimbursements provided to Street during his tenure as Trustee. As discussed *supra* Section V.E.3, the process of the monthly payment of his personal credit card by the FdM entity without receipt of any backup support whatsoever from Street could best be described as highly unusual.

Although Street testified that he had been the CEO of more than five companies and was generally familiar with how companies were run, Transcript at 520-21, Street did not seem to think it unusual that his expenses were reimbursed without the need to submit an expense report, trip report, receipts, and/or any explanation of the business purpose of the expense. Street also testified that there was no written policy for expense reimbursements, other than his own "business judgment." Transcript at 520. When asked if employees of the U.S. Holding Company and FdM were required to fill out a form to be reimbursed, Street said "they may or may not have." Transcript at 523-24. The Successor Trustee is informed and believes that while Street was not required to fill out a form to be reimbursed, all other employees were either required to, or filled out an expense reimbursement form of their own volition.

The Successor Trustee believes that it is reasonable to question whether many of these reimbursed expenses had a valid business purpose. A few selected examples are:

- An all-expense paid trip to Hawaii for employees and their families in December 2002-January 2003;

-54-

Double A 0697

- A charter plane to enable Street to make a connection for a family vacation in Spain;

- Numerous charges at Barnes & Noble;

- In January 2002, over $10,000 charged to "Creative Leisure," a luxury tour travel agent. Transcript at 555;

- Haagen-Dazs ice cream. Transcript at 558;

- Gary's & Company clothing expense. Transcript at 559;

- Another trip to Hawaii in February 2001. Transcript at 560;

- Eye Glasses, and exam for same, which Street described as, "safety glasses." Transcript at 572;

- Prepaid amounts for "Fast Pass" commuter pass on toll roads, carpool lane, etc. Transcript at 579;

- Charges at Disneyworld in April 2002, which were described as "a planning meeting between Fruehauf de Mexico and Dorsey to try to have the companies work closer together." Transcript at 583;

- A trip to Antarctica for a Stanford Alumni association meeting. Transcript at 583-84;

- Trips for two to exclusive resorts in Brazil, Chile, Argentina, and Cabo San Lucas "seeking opportunities to sell trailers." Transcript at 587;

- Trip to Las Brisas Resort in Ixtapa, Mexico in May 2005.[40]

---

[40] Ixtapa is not near the FdM factory, which is an approximate one hour drive from Mexico City.

-55-

Double A 0698

- A speeding ticket, explained to be reimbursable because he was "traveling to a dealer" and because the officer would "arrest someone who is not willing to pay for the ticket at the point of infraction." Transcript at 591, 634;

- Replacement tires and wheels, costing $4572, which Street installed on a nearly-new company-paid car. Transcript at 599;

- $1136 for a stereo system for Street's company-paid car. Transcript at 604.

- Charges for an XM satellite radio (monthly subscription). Transcript at 610. Street testified that this XM radio was installed "at this date" in the Chevy Suburban owned by the Trust and that the XM radio was not removed from the Suburban when the Suburban was disposed of. Transcript at 610-11. The credit card statements, however, demonstrate that charges for the XM radio continued to be billed to the Trust up through the date of Street's departure in July 2005, long after the Suburban was disposed of by the Trust. The Successor Trustee is informed and believes that, after the Suburban was disposed of, an XM radio was continually observed in Street's personal auto, a Ferrari.

- Charges in the amount of $1969.32 at Maaco Auto Paint, for which Street could not recall the business purpose. Transcript at 615-16;

- Payments to a Doctor Strelzow, who Street described as a "brain surgeon." Transcript at 623. When asked about this charge, Street refused to answer based on the fact that it "would dramatically injure [his] business career should it be made public or available." Transcript at 624. Upon information and belief, Dr. Strelzow is a Certified Facial and Plastic Surgeon and ear, nose, and throat

Double A 0699

specialist. Street stated that he felt it was "appropriate" to expense the charge to

Fruehauf de Mexico, but refused to explain why. Transcript at 624;

- Charges in the amount of $307 at a men's clothing store, explained to be a gift of shirts and ties to an employee. Transcript 632-33; and

- Payment of a parking ticket in Laguna Beach on his personal auto, a red Ferrari. Transcript at 636.

These reimbursements were substantial, amounting to $477,526.43 from July 2001 to

August 2005, or approximately $ 120,000 per year, including $94,000 that are currently

accounted for as "miscellaneous." There were numerous hotel, and restaurant charges with no

indication of their business purpose, and over $270,000 in airfare alone. The process for Street's

reimbursements, by virtue of its complete lack of the proper recordkeeping formalities and

checks and balances, opened the door to the potential for fraud and abuse.

As an example, when questioned about a $4000 credit balance that had been overpaid by

FdM on Street's personal credit card prior to Street's departure, Street refused to discuss the

matter, indicating that he did not know how to read the information contained on the credit card

statement he was shown. Transcript at 648-658. The Successor Trustee has since demanded an

accounting from Street, who has refused, based on Street's assertion that the copies of Street's

online credit card statements printed by FdM for purposes of documenting Street's expense

reimbursement are Street's "property." As such, Street has refused to make an accounting until

this "property" is "returned" to him, claiming that he is in no position to make any determination

of the status of the account.[41]  As stated above, however, Street's credit card account was

---

[41] Street has requested copies of certain information he claims is his "personal information" from the Trust. The Successor Trustee has invited Street to make copies at a mutually convenient date and time at Street's own expense and under the supervision of the Successor Trustee. To date, Street has not accepted this invitation.

Double A 0700

accessed online by FdM personnel, and Street should have received the original statements.
Alternatively, Street should be able to obtain these statements himself through online access, if
he has failed to retain the originals. In any event, the Successor Trustee believes that Street has
no right to retain this $4000 credit, and that Street should return it to the Trust immediately, with
interest.

VI.

CONCLUSION

The foregoing constitutes the Successor Trustee's Preliminary and First Report. During
the eight years of Mr. Street's tenure of the trustee of the liquating Trust Street: (i) did not
liquidate the Trust's substantial operating asset, FdM; (ii) instead engaged in two failed
*acquisitions* of bankrupt companies; (iii) co-mingled assets belonging to disparate beneficiaries;
(iv) became the subject of at least seven federal government investigations for wrongdoing, (v)
spent approximately $10 million (the $4.6 million opening cash balance plus an additional $6.6
million extracted out of FdM), (vi) failed to properly file and pay corporate and real estate taxes;
(vii) failed to maintain corporate and accounting records, (vii) and paid himself and his wife
approximately $2.06 million in compensation during this time, exclusive of reimbursed
expenses, which themselves amounted to almost half a million dollars.

The Trustee continues to gather information and intends to petition the court to compel
Street's attendance for further examination. In particular, further examination of Street is
necessary in light of the severity of the issues uncovered by the Successor Trustee's deposition
of Street conducted January 17-19, 2006. Furthermore, Street's uncooperative demeanor during
the deposition greatly hampered the Successor Trustee's progress. Indeed, Street assiduously
avoided answering probing questions, for example, at one point refusing to answer whether a fact

-58-

Double A 0701

was "true" because the term "true" was not a defined term. Transcript at 151. In the end, after a arduous process of attempting to elicit responses from him, Street abruptly brought the deposition to a halt after only two days, refusing to finish.

As noted, the Successor Trustee intends to petition this Court for an Order compelling Street to submit to further examination and to comport himself at that examination with due respect for the authority and contempt power of this Court.

The Successor Trustee plans to supplement this Report as soon as reasonably possible following the Trustee's completion of further examination of Street and any other appropriate persons.

Dated: March 14, 2006

                                    Respectfully,

                                    /s/ Daniel W. Harrow
                                    Daniel W. Harrow, Successor Trustee

**BAKER & McKENZIE LLP**
101 W. Broadway, Twelfth Floor
San Diego, CA 92101
Telephone: (619) 236-0441
Facsimile: (619) 236-0429

By: /s/ Ali M.M. Mojdehi
      Ali M.M. Mojdehi
      Janet D. Gertz

Attorneys for the End of the Road Trust
as successor to Debtors and Debtors in Possession

SDODMS1/658606.13

Double A 0702