IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| DOUBLE A TRAILER SALES, INC. ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | CIVIL ACTION NO: 05-1107 |
| v. ) | |
| ) | |
| CHRISS W. STREET and ) | |
| DONALD R. SHEETZ ) | |
| ) | |
| DEFENDANTS. ) | |

**DEFENDANT CHRISS W. STREET'S PRE-TRIAL BRIEF**

**I.     INTRODUCTION**

In this action the Plaintiff, Double A Trailer Sales, Inc. ("Double A") alleges the Defendant Chriss W. Street ("Street") defrauded Double A, suppressed material facts, and conspired to defraud Double A based on alleged representations made by Street to Double A during the course of Street's duties as president of Dorsey Trailer Company, Inc. ("Dorsey"). Street will demonstrate at the trial of this matter that Double A's claims are without merit. Double A cannot produce substantial evidence to show that Street suppressed material facts from Double A, that Street intended to defraud Double A, that Double A relied on any representations allegedly made by Street, or that any such reliance by Double A was reasonable under the circumstances.

During the summer of 2003, Dorsey began facing financial strains. Even Double A admits in paragraph 9 of its complaint that "[d]uring late 2003, Double A placed substantial trailer orders, the vast majority of which were on back-order by Dorsey." Moreover, as early as July 2003, Double A's president, Mark Wannemacher ("Wannemacher") expressed his concern about the viability of Dorsey when he heard that Dorsey may cancel one of Double A's orders.

Not only did Wannemacher have this concern, but so did his salesmen. In order to have its order fulfilled, Double A offered to prepay for the trailers. This resulted in the trailers being built and delivered to Double A.

Dorsey called a dealer and customer meeting to be held at the Dorsey manufacturing facility in Elba, Alabama in October 2003. At the time Dorsey proposed the dealer meeting, it was a known fact among Dorsey's customers that Dorsey was having financial problems as of October 2003. Representatives from Double A attended the dealer meeting.

At or about the time of the dealer meeting, Double A had an Order for fifteen (15) refrigeration trailers ("Reefers"). After the meeting, instead of prepaying for the trailers, as it had done before, Double A entered into an agreement (the "Purchase Agreement") with Dorsey whereby Double A purchased 491,669 pounds of new and untainted aluminum flooring for $413,235.00. The agreement was prepared by attorneys representing Double A and specifically states it was in lieu of prepaying for trailers Double A had ordered. The agreement further provides that if Dorsey fails to deliver the trailers on or before December 25, 2003, Double A would be entitled to a 5% reduction per month from the sales price of each trailer not timely delivered. Clearly, then, as of November 13, 2003, Double A had serious questions about Dorsey's financial condition and its ability to perform. This is clearly manifested in that it did not prepay for trailers, but "purchased" new aluminum flooring with a view of "reselling" it back to Dorsey at the same price once the trailers were delivered.

Street believes that Double A will testify that by January 2004 it had not received the 15 trailers, which were related to the Purchase Agreement. Indeed, Street expects Double A to testify that it did not receive those trailers until sometime in February 2004. Even though Double A had not received its trailers, on or about January 13, 2004, Double A placed additional

orders for trailers and prepaid certain invoices. Soon thereafter, on or about February 10, 2004, Wannemacher asked Tasha Dolan to send him a letter acknowledging an operating loan in the amount of $404,970.30 due to Double A.

Immediately following the delivery of the letter from Tasha Dolan, Wannemacher had his attorney draft a secured demand note to be signed by Dorsey to evidence the operating loan to Dorsey by Double A. This note provides for payment on demand and purports to be secured by 152,897 pounds of new and untainted aluminum flooring. The note was executed by Street as President of Dorsey on or about February 12, 2004. Contrary to the provisions of the previous Purchase Agreement, the Secured Note did not include any mention of the purchase of trailers, any terms related to the delivery of any trailers, or the reselling of the aluminum once the trailers were delivered. Accordingly, Double A's characterization of this source of money as being a prepayment for the production and delivery of trailers is not supported by the documentation.

From January 2004 to March 2004, Dorsey continued in operation, obtaining orders and manufacturing trailers. During this period, there were several discussions and exchanges of information between Dorsey and Double A regarding the possible purchase of Dorsey by Double A. These exchanges included face-to-face meetings at the Dorsey plant, telephone calls, exchange of financial information, and conversations between accountants for both companies. The vast majority of exchanges were between representatives of Double A and Tasha Dolan. Street had very little involvement in these discussions. Double A was given financial and other information so it could make a decision whether or not to invest in Dorsey. It should be noted that Double A was fully aware that Dorsey was in financial straights from the summer of 2003 through the spring of 2004. Its reason for considering an investment in Dorsey was based on the fact that the trailer market was hot. At no time did Mr. Street or for that matter, anyone at

Dorsey withhold information from Double A. Indeed, at one point Tasha Dolan advised Double A's accountant that Dorsey was having problems getting certain information from its accountant due to a past due bill.

The following are some facts, which will demonstrate the true state of affairs during the spring of 2004:

1/13/04 - Wannemacher contacts his accountant about purchasing Dorsey.

1/13/04 - Double A places the following orders for several trailers and wire transfers $659,832.04 to Dorsey on January 20, 2004:

| Invoice Number | Date | Amount |
| --- | --- | --- |
| M302239 | 1/13/04 | $20,235.00 |
| M303040 | 1/13/04 | $232,250.00 |
| M302438 | 1/13/04 | $25,348.00 |
| M302993 | 1/13/04 | $25,348.00 |
| M303064 | 1/13/04 | $95,640.00 |
| M303060 | 1/13/04 | $25,946.00 |
| M302152 | 1/13/04 | $248,530.00 |
| | | Total: $673,298.00 |
| | | less 2% prepaid discount of $13,465.96 |
| | | Net Total: $659,832.04 |

1/20/04 - After the order, Wannemacher writes Street and speaks to the importance of the production schedule. There is nothing in the invoices, however, which indicates a delivery date or a schedule relating to the delivery of these trailers. It should also be noted that Double A is only seeking payment in this lawsuit for four of these seven invoices because some of the trailers were delivered as contemplated by Dorsey and Double A. Of the remaining four invoices, M303040, M303060, M303064 and M302152, the amount listed in the complaint is the full invoice amount without the 2% discount given to Double A. Accordingly, the actual amount

4

paid by Double A on these invoices was $583,064.41. Additionally, Dorsey delivered the trailers reflected in M303064 to Double A and Double A sold them to Wood Leasing, Inc. on or about February 9, 2005, for a purchase price of $23,500 each or $117,500.00. Consequently, of the twenty-eight (28) trailers ordered, Double A received eight (8) from Dorsey.[1]

1/20/04 - Double A's accountant receives the following information from Tasha Dolan at Dorsey:

> Dorsey's Consolidated Amended Balance Sheet dated 6/22/01;
> Dorsey's Consolidated Amended Financial Statement dated 12/31/01;
> Dorsey's Internal Balance Sheet (asset section only) and Income Statement for the twelve-month period ending 12/30/02 for Dorsey;
> Dorsey's Internal Balance Sheet and Income Statement for nine-month period ending 9/30/03 for Dorsey.

2/3/04 - James Stroh, Double A's accountant ("Stroh"), emails Wannemacher and gives him a preliminary assessment of Dorsey based on information received to date. In the memo, Stroh tells Wannemacher about the existence of $2.0 Million in debt owed to the City of Elba and that Dorsey owes End of the Road Trust $723,000 as of 12/31/01. Stroh's spreadsheet shows inter-company debt of over $1.4 Million as of 9/30/03. He notes that gross profit for Dorsey is well below industry standards and inventory is too high for sales. Consequently, as of 2/3/04, Wannemacher has a good picture of Dorsey's financial condition and is also aware of its cash flow problems.

2/9/04 - With the foregoing information in hand, Wannemacher signs the Confidentiality Agreement. In it, he promises to keep confidential all of the information provided to him by Dorsey. As will be stated later, Wannemacher uses certain information supplied by Dorsey to contact vendors in an attempt to file an involuntary bankruptcy case against Dorsey.

2/10/04 - Wannemacher writes to Tasha Dolan regarding the need for an acknowledgement of the operating loan. He states in the email: "And Tasha, I really appreciate the opportunity to work with you. I hope you are comfortable with me and what's going on. I sincerely believe that Dorsey is on a threshold of a major breakthrough. It would be a pity if we were unable to capitalize on the situation. I know you and Chriss have struggled through a very difficult time, maybe now we can jointly reap the benefits."

2/10/04 - Tasha Dolan sends a letter to Double A acknowledging an operating loan of $404,970.30 to Double A.

2/11/04 - Tasha Dolan emails Stroh advising him of the state of the loan with City of Elba and that it expires on April 24, 2004.

2/12/04 - Chriss Street signs the Secured Demand Note.

2/12/04 - Double A wires $134,990.10 to Dorsey.

---

[1] It should be noted that Wood Leasing is an Alabama trucking company located in Mobile and is outside the dealership territory granted to Double A in its dealership agreement.

5

2/13/04 - Tasha Dolan advises Stroh that she is having trouble getting financial information from Dorsey's accountants due to an unpaid invoice. Stroh advises Wannemacher of the issue with Dorsey's accountants.

2/13/04 - Double A wires $134,990.10 to Dorsey.

2/16/04 - Stroh receives the November 30, 2003 internal financial statement from Dorsey.

2/17/04 - Stroh and Wannemacher discuss Stroh's review of materials provided by Dorsey and Stroh's assessment.

2/18/04 - Double A wires $134,990.10 to Dorsey. This wire combined with the wires of like amount earlier in the month are the funds advanced under the Secured Note.

On or about March 3-5, 2004, Wannemacher and Stroh visited Dorsey to meet with Chriss Street, Don Sheetz, Tasha Dolan, and representatives of SouthTrust Bank. The purpose of this meeting was to discuss Double A investment in Dorsey. Subsequent to the March meeting, Double A advised Dorsey that it was not interested in pursuing any investment. Shortly thereafter, Dorsey was contacted by Steve Diller ("Diller"), a bankruptcy attorney for Double A, demanding that Dorsey pay Double A the money it had advanced to Dorsey by prepayment or by loan. Diller threatened to file an involuntary petition under the bankruptcy code against Dorsey if Double A was not paid, and he further stated that he would buy Dorsey cheap out of bankruptcy. In April 2004, SouthTrust Bank, N.A. ("SouthTrust") enters a forbearance agreement with Dorsey and additionally agrees to advance an additional $250,000 to Dorsey. A management company hired to assist Dorsey opines that it believes Dorsey can return to profitability in due time.

At or about the same time, however, Double A begins contacting Dorsey's creditors in an effort to find two other creditors who would join Double A in filing an involuntary bankruptcy petition against Dorsey. Wannemacher admits in his deposition that he spoke to creditors about joining Double A in filing a bankruptcy against Dorsey. Of course, this action by Double A

6

violated the Confidentiality Agreement. In May 2004, Double A sued Dorsey and Dorsey's then bank, SouthTrust. It was not until after Wannemacher began contacting the creditors of Dorsey, and later Double A instituted the lawsuit against Dorsey and SouthTrust, that Dorsey could no longer manufacture trailers for any customers, including Double A.

Double A's and Wannemacher's actions of cutting off funding after Dorsey had committed almost its entire plant for the production of Double A's orders, contacting creditors and suppliers of Dorsey regarding the possible institution an involuntary bankruptcy against Dorsey and filing the lawsuit against Dorsey and SouthTrust precipitated the eventual shutdown of manufacturing at Dorsey. Street could not possibly foresee that these events would occur when he allegedly made promises to Double A about the ability of Dorsey to manufacture trailers. Moreover, Street did not at any time withhold or misrepresent the condition of Dorsey to Double A. As indicated in his email of February 9, 2004, to Tasha Dolan, Wannemacher saw a great profit for himself, and this is the reason he chose to advance money to Dorsey. Finally, at some point prior to March 2004, Wannemacher called Tasha Dolan and told her of a problem he had with his bank for prepaying for trailers and loaning money to Dorsey by drawing on his line of credit with Fifth/Third Bank. It is Street's belief that Wannemacher withdrew his funding as a result of his bank's pressure.

## II.    APPLICABLE LEGAL ANALYSIS

The issue in this case is one of promissory fraud. Despite the Plaintiff's phrasing in its Complaint and Amended Complaint regarding the fraud, under Alabama substantive law, the Plaintiff alleges an issue of promissory fraud. Alleged misrepresentations concerning the performance of promises are construed as attempts to state claims of promissory fraud. Bethel v. Thorn, 757 So.2d 1154, 1160 (Ala. 1999). In this case, any alleged misrepresentations made by

7

the Defendant directly concerned the ability of Dorsey to manufacture trailers for which the Plaintiff prepaid. In other words, the alleged misrepresentations by the Defendant dealt with Dorsey's promise to build trailers for the Plaintiff in exchange for prepayment.

In Bethel v. Thorn, the Alabama Supreme Court held that despite the plaintiff's categorization, the allegations actually indicated a possible claim for promissory fraud, not just fraud. 757 So.2d 1154, 1160 (Ala. 1999). In Bethel, the plaintiff and defendant negotiated a contract for the manufacture and delivery of an engine. Id. at 1156. As a condition of the contract, the defendant required the plaintiff to prepay the purchase price. Id. Subsequently, the engine was not delivered on time. Id. Despite the plaintiff's reference to a count based on these facts as stating fraudulent misrepresentation claims, the Alabama Supreme Court determined "because the alleged misrepresentations concern the performance of promises, that is they concern [the defendant's] ability to perform the contracts and the promised act of 'timely' delivery of the engine, transmission, and generators, we construe these allegations as attempts to state claims of promissory fraud." Id., at 1160.

In this case, any alleged misrepresentations regarding the financial status of Dorsey concern Dorsey's ability to manufacture the trailers for which Double A prepaid, and thus only states a claim for promissory fraud.

    **A.**    **Promissory Fraud**

To establish promissory fraud, the plaintiff must show "(1) a false representation; (2) of an existing material fact; (3) that is [reasonably] relied upon; (4) damage resulting as a proximate cause[; (5) that] at the time of the misrepresentation, the defendant had the intention not to perform the promised act[;] and (6) that the defendant had an intent to deceive." Pinyan v.

8

Community Bank, 644 So.2d 919, 923 (Ala. 1994). The Plaintiff bears the burden of proving all of these elements.

Despite Plaintiff's assertion in Count I of its Amended Complaint, reckless misrepresentation or mistaken misrepresentation of facts is insufficient to establish promissory fraud. (Plaintiff's Amended Complaint ¶ 20). The Plaintiff must first establish that Street made promises to Double A and at the time of the promises that Street had both the intention not to perform the promised act and the intent to deceive Double A. Double A must show that Street made promises and that he did not intend to build the trailers for Double A at the time of the promises, and that Street's promises were intended to deceive Double A.

Double A must also prove reasonable reliance upon the alleged misrepresentation. "An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation." Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1160 (Ala. 2003). Furthermore, the plaintiff bears the burden of proving by substantial evidence the element of reliance. Allstate Ins. Co. v. Eskridge, 823 So.2d 1254, 1264 (Ala. 2001). In determining what constitutes legal reliance, the Alabama Supreme Court has stated:

> To determine whether or not a misrepresentation was actually relied upon, whether it was a cause in fact of the damage, the sine qua non rule is often applied. If the plaintiff would not have acted on the transaction in question but for the misrepresentation, such misrepresentation was an actual cause of his loss. If he would have adopted the same course irrespective of the misrepresentation and would have sustained the same degree of damages anyway, it can not be said that the misrepresentation caused any damage, and the defendant will not be liable therefor.

Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortgage Co., 390 So.2d 601, 611 (Ala. 1980).

Double A's alleged reliance on any representations made by the defendant must also be reasonable. Foremost Ins. Co. v. Parham, 693 So. 2d 409 (Ala. 1997). In Foremost, the

9

Alabama Supreme Court reinstated the reasonable reliance requirement for fraud, because in their view it allowed "a more practicable standard that will allow the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." Id. at 421. (See also Baker v. Metro. Life Ins. Co., 907 So.2d 419, 421 (Ala. 2005) stating, "in order to satisfy the reliance element of his fraud claim [the plaintiff] must show not only that he relied on [the defendant's] alleged misrepresentation regarding the number of premiums required, but also that that reliance was reasonable in light of the facts surrounding the transaction in question."). As indicated above, Double A made prepayments and operating loans in the face and the knowledge of Dorsey's financial condition. It cannot now say it was defrauded or did not know. It cannot stick its head in the sand. Double A saw the opportunity and was advancing money to help Dorsey capitalize on the situation and "jointly reap the benefits".

### B.     Conspiracy

The Plaintiff has also alleged conspiracy to commit fraud. Since the underlying claim of fraud on which the conspiracy is based is not a valid claim, the conspiracy claim also fails. Furthermore, Double A has dismissed the other alleged co-conspirator and this then cannot be a conspiracy even if the underlying action was established.

Respectfully submitted this the 18th day of October, 2006

/s/ Clark R. Hammond
Clark R. Hammond

                                              Phillip B. Greer
                                              Lindan J. Hill
                                              Attorneys for the Defendant

**OF COUNSEL:**

**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone: (205) 458-9400
Facsimile: (205) 458-9500

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of the above and foregoing has been served upon the following listed persons by electronic service this October 18, 2006.

Eric Breithaupt, Esq.
Lynn Shutt Darty, Esq.
Richard Earl Smith, Esq.
Christian & Small, LLP
505 20th Street North
Birmingham, Alabama 35203-2695


                                      __/S/ Clark R. Hammond_____