IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| DOUBLE A TRAILER SALES, INC., | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CIVIL ACTION NO. 3:05cv1107-T |
| v. | ) |
| | ) |
| CHRISS W. STREET | ) |
| | ) |
| | ) |
| DEFENDANT. | ) |

**PLAINTIFF DOUBLE A TRAILER SALES, INC.'S PRE-TRIAL BRIEF**

COMES NOW Plaintiff, Double A Trailer Sales, Inc. and submits this pre-trial brief.

**I.     PARTIES**

Plaintiff Double A Trailer Sales, Inc. ("Double A") is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in the State of Ohio. Defendant Chriss W. Street ("Street") is an individual resident and citizen of the State of California. Defendant Street served as President of Dorsey Trailer Co. ("Dorsey") from its inception to shortly before the company filed for bankruptcy protection.

**II.    PLAINTIFF'S CLAIMS AND APPLICABLE LAW**

In this action, Plaintiff alleges that Defendant Street, while president of Dorsey, made material misrepresentations during business dealings with Mark Wannemacher, president of Double A, which were relied upon by Double A to its material detriment. Specifically, Double A asserts that Street committed various frauds under Alabama law by his material misrepresentations of both existing facts and future acts, and further claims that Double A reasonably relied on these misrepresentations to its detriment.

Double A asserts that Street committed innocent fraud.  The elements of innocent fraud are: (1) an innocent or mistaken misrepresentation; (2) concerning an existing material fact; (3) made by defendant with the intent to induce plaintiff to act; (4) reliance by plaintiff (5) proximately resulting in damage to plaintiff.  Alabama Pattern Jury Instructions 18.03; Lynn Strickland Sales and Service, Inc. v. Aero-Lane Fabricators, Inc., 510 So. 2d 142 (Ala. 1987)(overruled on other grounds by Alfa Mut. Ins. Co. v. Roush, 723 So. 2d 1250 (Ala. 1988)).

Double A further asserts that Street committed reckless fraud.  The elements of reckless fraud are: (1) reckless misrepresentation; (2) concerning an existing material fact; (3) made by the defendant recklessly or without sufficient information therefor; (4) With the intent to induce plaintiff to act; (5) reliance by plaintiff; (6) proximately resulting in damage to plaintiff. Alabama Pattern Jury Instructions 18.02; Parker v. Johnson-Smith Realty, Inc., 465 So. 2d 415 (Ala. Civ. App. 1984).

Double A asserts that Street committed intentional fraud.  The elements of intentional fraud are: (1) an intentional misrepresentation; (2) concerning an existing material fact; (3) made by defendant with knowledge of its falsity; (4) with the intent to induce plaintiff to act (5) reliance by plaintiff (6) proximately resulting in damage to plaintiff.  Alabama Pattern Jury Instructions 18.01.

Double A asserts that Street committed promissory fraud.  The elements of promissory fraud are: (1) a false representation; (2) of a material existing fact; (3) reasonably relied upon by plaintiff; (4) proximately resulting in damage to plaintiff; (5) proof that, at the time of the misrepresentation, the defendant had the intention not to perform the act promised; (6) proof that the defendant had the intent to deceive.  Alabama Pattern Jury Instructions 18.07; Padgett v. Hughes, 535 So. 2d 140, 142 (Ala. 1988).

Lastly, Double A asserts that Street conspired within Dorsey to commit these fraudulent acts. Under Alabama law, a civil conspiracy requires a combination of two or more individuals to accomplish an unlawful purpose or to accomplish a lawful end by unlawful means.[1] Thompson Properties 119 AA 370, Ltd. v. Birmingham Hide and Tallow Co., Inc., 897 So.2d 248 (Ala. 2004).

### III.    WHAT PLAINTIFF'S EVIDENCE WILL SHOW

At trial, Plaintiff will submit the following evidence. Dorsey is the progeny of Dorsey Trailers, Inc., which was liquidated in Chapter 11 bankruptcy case filed in the United States Bankruptcy Court for the Middle District of Alabama (Case Number 00-06792-WRS). By order entered on June 7, 2001, substantially all of the assets of old Dorsey were sold to the Fruehauf Trailer Retirement Plan ("the Plan"). The Plan was owned by Pension Transfer Corporation, a subsidiary of the End of the Road Trust. The End of the Road Trust also owns American Trailer Industries, Inc. ("ATI"), of which Defendant Street was the President. ATI owns Fruehauf De Mexico S.A. De C.V. (hereinafter "Fruehauf Mexico"), whose President was also Defendant Street.

In June of 2001, Dorsey was restarted by its new owner with Defendant Street as the President. From Summer 2001 through the end of 2003, new Dorsey manufactured over-the-road trailers. By the end of 2003, the manufacturing capabilities of Dorsey began to lag. In early 2004 manufacturing dwindled and by March, Dorsey undertook almost no further manufacturing, laying-off the bulk of its work force. Even though Dorsey was on a C.O.D. basis

---

[1] It is worth noting that, where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action; the gist of the action is not the conspiracy alleged but the wrong committed. Thompson Properties 119 AA 370, Ltd. v. Birmingham Hide and Tallow Co., Inc., 897 So.2d 248 (Ala. 2004).

with most of its suppliers and had inadequate inventory on site to manufacture trailers, Defendant Street nevertheless represented to Plaintiff that Dorsey was in no material financial difficulty.

Double A will show that since 1975 Plaintiff has been a substantial dealer in the over-the-road trailer business. In March 2003, Double A became a distributor for "new" Dorsey through the execution of a "Distributor Sales and Service Agreement." During late 2003, Double A placed substantial trailer orders, the vast majority of which were placed on back-order by Dorsey.

To fill a special order, Double A prepaid Dorsey Invoice Number M302949 in the amount of $404,970.30 on, or about, November 17, 2003, for the purchase of 15 2005 53' Overall Refrigerated Trailers (hereinafter the "Zachrich Trailers"). At the time the order was placed, Defendant Street knew that time was of the essence and that delivery by December 31, 2003 was crucial to Plaintiff in order to satisfy an order for Double A's oldest customer. Rather than utilize the pre-payment to manufacture the Zachrich Trailers, Dorsey, acting at the direction of Street, spent the money for other purposes. Double A will show that Defendant Street knew, or should have known that, at the time the November 17, 2003 pre-payment was made that Dorsey had inadequate means with which to complete the Zachrich Trailers on a timely basis.

By late January 2004, even though the Manufacturer's Statements of Origin ("MSOs") had been issued for the Zachrich Trailers, manufacture of those units had not been completed. Double A, based on the continuing representations of Defendant Street, continued to place orders and prepaid the following invoices in the following amounts on January 16, 2004:

| Invoice  | Amount Paid  |
|----------|--------------|
| M30340   | $232,250.00  |
| M30360   | $ 25,427.08  |
| M30364   | $ 93,727.20  |
| M302153  | $243,559.40  |

In total, Double A had pre-paid orders of $999,933.98 by January 16, 2004. By email dated January 20, 2004, directed to Defendant Street, Double A stressed the need for compliance with a "strict" production schedule. Within days thereafter, Defendant Street for the first time revealed that Dorsey was unable to produce trailers on any basis remotely approximating the requirements of Double A, and had not completed the Zachrich Trailers. Meanwhile, after having prepaid nearly $1.0 million for trailers to be built by Dorsey, customers of Double A began to demand delivery, and some would, eventually, take their business elsewhere.

By early February 2004, the Zachrich Trailers were finally ready for delivery. Rather than simply deliver the trailers, Street told Wannemacher that unless Double A paid for that grouping of trailers a second time, delivery would be refused. In essence, Street was holding completed, prepaid goods worth hundreds of thousands of dollars hostage in order to extract more money from Double A. This was done by Street with full knowledge that Double A's oldest and best customer, Zachrich, was demanding delivery and that Dorsey was already over a month late. Though Double A did then receive the Zachrich trailers, it was then left with little option other than to make a loan to Dorsey to shore-up the company's cash flow shortfalls.

Wannemacher and Defendant Street then set about to discuss the terms of Plaintiff's additional advance to Dorsey such that the Zachrich Trailers would be released. The parties discussed the execution of a "Secured Demand Note." Double A will show that at the time Plaintiff advanced the additional sum of $404,970.30, in reliance upon the representations of Street, that there was no present intent to repay the money. Double A further will show that the "Secured Demand Note" contained a pledge of "152,897 pounds of new and untainted aluminum flooring" (hereinafter the "Raw Materials"). Double A will show that Street represented that the Raw Materials were free and clear of any liens. In actuality, Street knew, at the time of this

representation, that the Raw Materials were subject to the blanket lien of SouthTrust Bank. As early as April 15, 2004, Defendant Street would later admit, in written internal correspondence, that the Raw Material was also consigned inventory that was the property of Fruehauf Mexico. Double A will show that it relied upon these representations of Street that Dorsey had the authority and ability to pledge the Raw Materials as collateral for the additional advance of funds by Plaintiff in the amount of $404,970.30. Double A will further show that no corporate resolution was obtained to authorize the execution of the "Secured Demand Note," and that if the Plan had known about the loan Defendant Street would have been terminated. In addition, Double A will show that the representations made by Street were false and made with the intent that Plaintiff would rely upon them.

At the same time that Street was engaged in making multiple misrepresentations to Double A as to the financial status of Dorsey and the ability of Dorsey to perform as promised, Street had actual knowledge that Dorsey was continually overdrawn at the bank (often by many thousands of dollars), that the company wrote numerous NSF checks on a monthly basis, that primary suppliers had placed Dorsey on a COD basis and that conditions in the marketplace were tight such that marginal purchasers of inventory like Dorsey had difficulty obtaining goods to complete the manufacturing process. But for the money advanced by Double A, Dorsey would have foundered sooner hastening Street's day of reckoning - - a day which eventually did come - - with his masters at the Plan which would come about to his ruin.

Finally, there will be evidence proffered in defense of the fraud by Street that Double A's reliance was misplaced or unreasonable. Much of that tender will surround the time frame of late January 2004 to about March 6, 2004. Street inquired of Double A and/or Wannemacher whether there might be an interest in acquiring ownership in all or part of Dorsey. The idea of

having its own dedicated supply of trailers was appealing to Double A, so due diligence was commenced. On or about February 9, 2004, a "Confidentiality Agreement" was executed between Wannemacher and Dorsey. From February 2004 to March 5, 2004, Double A's accountant, James Stroh, collected various financial information from Dorsey by way of its CFO, Tasha Dolan. The testimony and evidence presented will be that these materials were only provided after multiple proddings, were delivered piecemeal and were often incomplete at best. Stroh did his best to assimilate that information into a briefing book which was delivered to Wannemacher at the Montgomery, Alabama airport on or about March 4, 2004. A series of meetings ensued the next day between Wannemacher and Stroh on behalf of Double A and Street, Dolan and others on behalf of Dorsey. Through that meeting, Double A learned definitively for the first time that things were truly "rotten in Denmark." Regrettably, Double A had already advanced its money for trailers which would never be built and funds which would never be repaid.

Of course, testimony at trial will determine the forms of fraud that are to be submitted to the jury. Among other testimonial evidence, plaintiff submits that the following representations will be given at trial consistent with previous deposition testimony:

- A. There was a meeting, a dealer meeting in the fall of 2003 and Chriss had invited us all down there to show us all the good things he was doing. And, you know, we all had discussion about having problems getting materials and Chriss explained that is a cash flow problem.

(Deposition of Mark Wannemacher, dated August 31, 2006, at p. 35:13-19).

- Q. Okay. And he obviously had you in to show you what he was doing. Was there something going on prior to that meeting that had the dealers uneasy or concerned about being able to get trailers?

- A. Just that delivery was creeping out. But he assured us at that meeting that everything was fine financially, they were trying to set up a line of credit, and they had good equity position and there was no debt with the company.

- Q. No debt with the company?

- A. Long-term debt, or I guess the way I would say it is he told us that when we capitalize the company, Dorsey, through a pension fund supplied the money and that they didn't have any outstanding loans.

- Q. And he told you that at the dealer meeting?

- A. Yes, he told me and I think he told – well, he told everybody.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 36:11-37:6).

- A. [S]o when he came up with the Zachrich trailers like that, I asked him if he had any collateral. He said, yes we've got a bunch of aluminum that we own free and clear. And he's like, we can use that for collateral for you if you want to set up a note. I said, fine, I called my attorney and we got on a conference call. I kept Chriss on the phone for a conference call and Steve Mansfield, my attorney, asked him the same question. In fact, he said something about the fact are there any encumbrances against this equipment, and Chriss said absolutely not, we own it free and clear, it's inventory to Dorsey. And he said we can use that for collateral for the trailers if you forward the money.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 53:15-54:6).

- A. This is one I was telling you about when he asked me to pre-pay for those trailers. He called and asked me if I could pre-pay for those trailers because he was having a cash flow problem. And as I told you in the case of PDQ's floors, I was a little uncomfortable with that so I asked him if he could hold a minute. I called my attorney, Steve Mansfield, and we had a conference call discussing this.

- A. And Chriss brought - - well, I told Chriss I would need some sort of collateral to do that. And Chriss says, well, I got this aluminum, and he said it's new and untainted aluminum flooring. I asked him if it was owned by Dorsey, and he said - - well, he said it was owned by Dorsey. And I asked if there was any liens on it or anything and he said no. And, Steve, that's what I was saying earlier, Steve said something about encumbrances and liens and everything. Chriss says no, this is free and clear. I had been at the factory so I knew he had a large inventory. So Steve drew up this document for Chriss to sign.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 62:19-63:18).

- The sequence of events, as I recall it, was is after I got back from my first trip, the next week the Zachrich trailers were finished, and they called and said you got to pay for them. I said, well, we already paid for them. They said, you got to pay for them again or we're not going to give them to you.

- Q. Who told you that?

- A. Chriss Street. How do you legitimize that? He said, well, we need additional cash flow. And I think we made a second note at that point to cover those particular trailers because he left me no choice then. Like you said, it was critical to get delivery. And quite, frankly, I felt like he was extorting me. But what you could do? I mean, I mean, I had a customer breathing down my neck that had been patient and now I knew his trailers were finished, but they weren't going to give them to me until I pay for them again. So now I'm stuck between a rock and a hard spot.

- Q. Why didn't you at that time just go down and hire Mr. Breithaupt, hire Mr. Diller, tell Mr. Mansfield, I'm done, we need to go get these trailers, I'm done with these folks?

- A. Because these folks had been good suppliers and we were working with them and we thought we would work it out. I mean, they had told me they were in an equity position. I mean, I had no reason to distrust him. He was, he had been a good supplier for a year and a half to two years. I had worked with him, I had helped him set up the sales organization and the dealer organization. Part of this has never really come out is when I first contacted Chriss, I actually introduced him to Terry Bertrand, who was the sales manager. I worked through the process of getting the whole organization set up. I didn't want to see this thing fall apart. You know, you got to have some sort of trust in a business relationship until somebody actually proves to you that they're not being up front at all.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 94:2-95:22).

- Q. All right. And how did it come about that this invoice was generated and that you paid a second time, why would you pay a second time?

- A. Because they told us they wouldn't release the trailers to us unless we did. And that's what I was telling you earlier, we were stuck in the position where we had a customer that was getting a little impatient getting the trailers, they had them completed, and they called us and told us if we didn't pay for them again, they wouldn't give them to us.

- Q. Why didn't you say we're done with you, we're not giving you any more money, give us our trailers, it's over?

- A. We, more or less, did in a very short time frame from there. But, you know, at that point we were talking a little bit about possibly purchasing with them. There's still the trust factor in there. You know, you've got the situation with Don Sheetz and Chriss Street saying that there's equity there, and you don't have another supplier to replace them either.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 127:11-128:9).

- Q. All right. Again, down it says, "Acting at the direction of Defendant Street Dorsey basically squandered the money." Tell me what you mean, number one, squandered the money.

- A. What I mean is he told me if I prepaid the trailers, he would use my money, prepayment money to buy the materials to finalize and finish the trailers. And, obviously, he did not do that.

- Q. How do you say obviously? Do you have - -

- A. Because I never got the trailers.

- Q. Do you have evidence that shows that he somehow squandered the money?

- A. Well, from reading the other depositions from what I can see, he spent it on other things rather than my trailers.

- Q. What did he spend it on that wasn't a part of the operation so that he could build trailers? What did he squander it on?

- A. Well, wait a minute, he said if I prepaid the trailers he would do it for my trailers. If he did it for somebody else's trailers, that's misrepresentation.

- Q. So you're saying that you had an understanding with Chriss that your money would not be used to run the operations, but they would only be used to build your particular trailers and no other expense?

- A. Yes. Well, other than normal business operating expenses. He had to pay employees to build my trailers.

- Q. Well, what about general overhead?

- A. He might have had some general overhead in there, but I don't want him going out and buying materials to build Cal-Fulmer's trailers with my money. I don't want him going out to buy materials to build Fleetco's or anybody, other customers, you know, buying materials for their trailers with my money, and then not build my trailers, and that appears to be what he did.

- Q. Okay. So that's how you would say he squandered the money?

- A. Yes.

- Q. If he used it for anything other than the direct cost to build your trailers?

- A. Yes, because that's what he represented he would do with it.

- Q. Okay. And your statement is that Chriss said that if you will prepay, I will only use this money for the direct cost to build your trailers?

- A. Yes.

- Q. When did he say that?

- A. When he said, when he - - he told me that with this group of trailers right here.

- Q. The ones in November, right.

- A. Then he told me the same thing with the ones we were doing in January.

- Q. And so when you say squandered, you mean anything where the money was paid for anything other than a direct cost for your trailers that was squandering?

- A. That's true. To me, that's squandering.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 218:10-221:1).

- Q. What representations in January did Mr. Street make to, only Mr. Street, not someone else, that caused you to place the orders that equaled this $600,000 - some odd?

- A. Representations that Chriss made is that there was nothing but a cash flow problem, they're in the process of getting that cleared, they're setting up a line of credit with some bank, which he indicated to me was SouthTrust, but they were working with somebody else. And that if we would pay for the balance of the trailers or these invoices here, that would help them because they could go to the bank.

(Deposition of Mark Wannemacher, dated August 31, 2006, at p. 223:10-23).

- [C]hriss is a very easy person to talk to. I mean, very - - how do I explain it to you? He comes across very trust worthy, and he comes across to be a very good guy, I mean.

- Q. Is it possible that he was, is it possible –

- A. No, I don't think so now. Then I did, but, no, I don't think so now.

- Q. Well, tell me why. Give me the things, the whatever numbers.

- A. Because he was telling me these things that, you know, everything is fine and everything else when it wasn't. I mean, he knew, from what I can see from discovery and everything else, he knew probably three months probably

beforehand that he was in trouble.  And he was telling me that he wasn't in any trouble at all.  He was telling me that he had equity position.  They had a situation where they had, Eisners told them to write down $2 million worth of inventory.  He never told me that.  We discovered that in a later discovery process.

- Q.  When did Eisner tell them to write down the inventory?

- A.  From what I understand from the discovery process they told them in 2001 or 2001, something like that.  Why didn't he tell us that up front?

- Q.  Would it matter?

- A.  It would have mattered a heck of a lot.

- Q.  If they had written it down under the financials that you saw.  They would have still been upside down?

- A.  But it would have mattered whether or not I would have done any of this stuff or if I had forwarded any money.

(Deposition of Mark Wannemacher, dated August 31, 2006, at pp. 224:11-225:24).

Based upon the law and the facts, Double A expects to be able to prove that Defendant Street is guilty of fraud.  Unlike many fraud cases where the damages are relatively minimal, this case presents a situation where Double A advanced nearly $1.0 million to Dorsey based upon the misrepresentations of Street, only to find a mere seven weeks later that Plaintiff would receive neither trailers nor a repayment of its advances.  Where Street, as president of Dorsey caused such an unbelievable waste in the use of Double A's funds, an award of punitive damages commensurate with the bad acts of Street is appropriate as well as recovery of the substantial actual damages incurred by Double A.

        Respectfully submitted,

        /s/ Eric J. Breithaupt
        Richard E. Smith
        Eric J. Breithaupt
        Attorney for Double A Trailer Sales, Inc.

**OF COUNSEL:**
CHRISTIAN AND SMALL LLP
Attorneys and Counselors
505 North 20th Street, Suite 1800
Birmingham, Alabama 35203
(205) 795-6588
(205) 328-7234 - Facsimile

## CERTIFICATE OF SERVICE

      Unless otherwise served by the ECF system, I hereby certify that I have this date served a copy of the foregoing pleading upon all counsel of record in this cause by placing a copy of same in the United States mail, postage prepaid, addressed as follows on this date: October 23, 2006

Clark Hammond
Lindan Hill
Attorneys for Chriss Street
Johnson Barton Proctor & Powell LLP
2900 AmSouth / Harbert Plaza
1901 6th Avenue N
Birmingham, Alabama 35203

Phillip B. Greer
Attorney at Law
1280 Bison Rd
#B9-531
Newport Beach, CA 92660

                                                   /s/ Eric J. Breithaupt
                                                   **OF COUNSEL**